# WHEELING.

Brazie et al. v. Fayette County Commissioners.

Submitted November 22, 1884.—Decided November 29, 1884.

1. The statute—sec. 3, ch. 73, Acts 1882—authorizing a judge of the circuit court, in vacation, to issue a writ of prohibition, is constitutional. Such judge, being thus authorized to issue such writ in vacation, may issue a rule for such writ returnable before him and hear the same in vacation, and a writ of error lies from his judgment thus rendered in vacation to this Court.

2. The writ of prohibition lies from a superior court not only to inferior *judicial* tribunals, but to inferior *ministerial* tribunals possessing incidentally judicial powers and known as *quasi* judicial tribunals, and also in extreme cases to purely ministerial bodies, when they usurp and attempt to exercise judicial functions.

3. Such writ lies from the circuit court to the county commissioners assembled in special session to ascertain the result of an election, under chapter 155, Acts of 1882, to prevent them from transcending their legitimate powers by examining witnesses and hearing evidence to determine whether the precinct-commissioners have certified and returned the votes of persons not entitled to vote with a view to rejecting such votes.

4. Aside from the *quasi* judicial functions necessarily incident to their duties in determining that the ballots, poll-books and certificates of the election returns laid before them are genuine, that they are in fact the returns and substantially in the form prescribed by the statute, and to correct or have them put in form if they are not so, the duties of said commissioners are purely min-

isterial, and their judicial functions are limited to the acts pre-
scribed in the twenty-first section of said statute.

5. The acts of said county commissioners must be based on the
returns as certified to them from the several voting places of the
county. The twenty-sixth section of said statute has no appli-
cation to their duties as canvasers of the election, the powers
therein conferred apply alone to the final judges of elections in
cases of contested elections.

The facts of the case are fully stated in the opinion of the
Court.

*J. H. & J. F. Brown* for plaintiffs in error.

*E. W. Wilson* for defendants in error.

SNYDER, JUDGE:

H. W. Brazie, A. W. Hamilton and John Kincaid pre-
sented their petition to the judge of the circuit court of Fay-
ette county, in which they state, that at the general election
for State and county officers held October 14, 1884, they were
candidates and voted for as such for county offices of said
county, that is, said Brazie for the office of prosecuting attor-
ney, Hamilton for clerk of the circuit court, and Kincaid for
county commissioner; that at said election M. Van Pelt, E.
H. Easley and J. C. Montgomery were candidates and like-
wise voted for as such for said respective offices, that is, said
Van Pelt for prosecuting attorney, Easley for clerk of the
circuit court and Montgomery for county commissioner, but
received a less number of votes for said respective offices than
did petitioners as appears by the returns of said election cer-
tified by the commissioners conducting the same at the several
voting places in said county; that, on October 20, 1884, the
commissioners of the county court assembled at the court-
house of said county, and the clerk laid before them the bal-
lots, poll-books and certificates returned to him by the
commissioners at said several voting places, in order that
they might ascertain and certify the result of said election in
said county; that upon the demand of the respective candi-
dates aforesaid the said commissioners proceeded to open the
ballots of a number of voting places and recount the same,
and having completed such recount as to a number of said

voting places, they suspended such recount and on the motion of said Van Pelt, Easley and Montgomery, proceeded to examine witnesses and hear evidence to prove that divers persons, at Wyant's and other voting places, not entitled to vote, had cast ballots for petitioners, to which action petitioners objected, but the said commissioners overruled said objection and, without notice of contest or opportunity to petitioners to defend their rights, proceeded to examine witnesses and hear evidence as to the right of persons to vote whose names were certified on said returns, and rejected six votes for petitioners so certified and returned by the commissioners at the voting place called Wyant's in said county; that said commissioners are still proceeding to examine witnesses and hear evidence outside of the returns for the purpose of proving that other persons who voted for petitioners were not entitled to vote, in order to exclude the votes of such persons in ascertaining the result of said election.

The petitioners, therefore, pray that a writ of prohibition to restrain and prohibit said commissioners of the county court from transcending their lawful authority and from going behind said returns and examining witnesses as to the right of persons to vote whose names are certified thereon with a view to reject the votes of such persons to the prejudice of petitioners, and to prohibit said Van Pelt, Easley and Montgomery from procuring said commissioners to proceed in said illegal manner; and that a rule may be awarded against them to show cause why said writ shall not issue, &c.

The said petition is duly sworn to, and on October, 27, 1884, the said judge awarded the rule as prayed for therein, returnable before him, in vacation, October 30, 1884. On the said day the parties appeared before said judge and on motion of the defendants, which was argued and heard, the judge discharged said rule and refused to issue the writ, and thereupon the petitioners applied to this Court for a writ of error, which was granted.

The parties appeared before this Court by consent, and as a preliminary matter the defendants in error, by their counsel, moved the dismissal of this writ of error for the want of jurisdiction in this Court to entertain it, for the following reasons: Because,

*First.* The judge of the circuit court had no authority to issue the rule in vacation;

. *Second.* If he had such authority, the rule should have been made returnable to and heard by the circuit court of said county, the judge thereof having no authority to hear it in vacation; and

*Third.* The commissioners of the county court, when assembled in special session for the sole purpose of ascertaining the result of an election held in their county, are not a court or such inferior tribunal against which a writ of prohibition will lie from a circuit court.

1. The writ of prohibition is as old as the common law. In England formerly it was used by the king as one of his high prerogative writs, and it was thereafter generally exercised only by the court of king's bench until 1873, when that court was merged in the high court of justice. Like other common law writs and remedies, it is regarded as generally applicable in this country, except in so far as it has been modified by positive statutory enactment. Our constitution provides that—

" The circuit court shall have supervision and control of all proceedings before justices and other inferior tribunals, by *mandamus, prohibition* and *certiorari.*" Sec. 12, art. VIII.

This provision does not warrant proceedings by *prohibition* in every case of supervision, but the meaning is that, where a state of facts exist which would warrant a writ of prohibition at common law, such remedy may be resorted to by the courts of this State. Whether or not this is an enlargement of the common law remedy by this writ, it is unnecessary to decide in this case. It is certain that it is no limitation or restriction of that remedy. By the common law, as I understand, this writ was at first exercised alone by the king, and subsequently by the high court of the king's bench, which seems to have been always open and followed the king's person wherever he went. 3 Bla. Com. 41.

In this country this writ, like the other extraordinary writs of *mandamus* and *habeas corpus*, has been frequently issued by the judges of courts in vacation and the power to do this is deduced from the common law practice, independent of any statutory enactment.—*State* v. *Stackhouse,* 14 S. C. 417;

*Connecticut River Railroad* v. *County Commissioners*, 127 Mass. 50.

Our constitution declares that: "The judicial power of the State shall be vested in a Supreme Court of Appeals, in circuit courts, *and the judges thereof*," &c.—Sec. 1, art. VIII. This plainly gives judicial power to the judges as well as the courts, and leaves it to the legislature to say, in all cases where there are no absolute prohibitions in the constitution, what portions of this judicial power shall be conferred upon the courts and what upon the judges thereof. The first provision of the constitution above quoted which provides that : " The circuit court shall have supervision," &c., is not intended as a limitation upon this general power given to the the courts and the judges thereof, but as a limitation upon the power of the legislature to deprive the courts and judges of the supervision and control of inferior tribunals. If the words " circuit court" as used in said twelfth section, are construed to deprive the legislature of the power to confer upon the judges of said courts jurisdiction over any of the matters therein mentioned, then the judges could not be authorized to grant injunction or award either writs of *mandamus* or *habeas corpus.* Such a construction would not only be unauthorized by the canons of construction, but it would be contrary to the universal practice in such cases and greatly impair the efficiency of the judiciary and embarrass the administration of justice.

The legislature in the exercise of its powers has expressly authorized a judge of the circuit court to issue a rule in vacation—Acts 1882, ch. 153, sec. 1, and it has likewise authorized such judge to award the *writ of prohibition* in vacation—*Id*, ch. 73, sec. 3, p. 170.

2. If the judge has the power to issue the writ in vacation, as we have shown he had, then it follows of necessity that he had the authority to make the rule returnable before him and hear it in vacation. The rule was a necessary preliminary notice, and as he had the right to issue the writ in vacation, the rule could not have been made otherwise returnable.

But it is argued that the right to issue the writ may be contested before a jury, and as no such contest can be had before the judge in vacation, the writ cannot be issued in va-

cation. It might be replied that this argument is in direct conflict with the plain declaration of the statute. But an examination of the proceedings in prohibition will show how this objection may be and always is obviated. Upon the return of the rule, the court or judge will make it absolute or discharge it; and in the former case, if the point be too nice and doubtful to be decided upon a motion, the court may direct the applicant to declare in prohibition before the writ issues, and ought to do so if the defendant demands it, which declaration concludes with a prayer for the writ. To this the defendant may demur or plead such matter as may be proper to show that the writ ought not to issue and conclude by praying that such writ may not issue. In such case, of course, the trial would be referred by the judge to the court where it could be had.—Acts 1882, ch. 153, sec. 1, p. 487; *Mayo* v. *James*, 12 Grat. 17, 26.

3. The remaining preliminary enquiry is, does the writ of prohibition lie from the circuit court to the commissioners of the county court sitting as canvassers of an election?

As we have seen our constitution gives the circuit court supervision and control of all proceedings before justices and other *inferior tribunals* by *mandamus prohibition* and *certiorai*. Whether the "inferior tribunals" here referred to include commissioners sitting as canvassers of an election, must be determined by the common law and the general principles found in the decisions of the courts of this country as deduced from that law. The common law definition of prohibition is, that it is an extraordinary judicial writ issuing out of a court of superior jurisdiction and directed to an inferior court or tribunal for the purpose of preventing the latter from usurping a jurisdiction with which it is not legally vested. High's Extr. L. Rem. § 762.

It has been held to lie to prevent a master in chancery from acting in excess of his powers in a judicial matter pending before him.—*Henshaw* v. *Cotton*, 127 Mass. 60. It will lie to justices and petty courts of limited and special powers. And will prevent such petty tribunals from manufacturing a jurisdiction for themselves.—*Girling* v. *Aldas*, 2 Nev. 617; *Hutson* v. *Lowry*, 2 Va. cas. 42.

Referees, appointed under a statute to hear and determine

the question of the right of way sought by one person over the lands of another, so far partake of the character of a judicial body as to be amenable to the writ of prohibition.— *State* v. *Stackhouse*, 14 S. C. 417. So a board of county commissioners acting in a judicial capacity in determining the damages to be paid for land taken for railway purposes, may be prohibited by this writ from proceeding with the enforcement of such damages under a law which is unconstitutional.—*Connecticut River Railway Co.* v. *County Commissioners*, 127 Mass. 50.

In *State* v. *Stackhouse, supra,* the court, after stating the former use of this writ, says: "But in practice it has subsequently gone beyond this limit, and it has not only been used to restrain *inferior judicial* tribunals within the orbit of their jurisdiction as to the subject matter conferred upon them, but it has also reached to their collateral proceedings when contrary to the common law or some statutory provision. Nor has it been confined entirely to inferior judicial tribunals, as seemed at first to be intended; on the contrary it has been extended to other public functionaries, officials and persons charged with the performance of a duty not wholly judicial, and not even very extensively or strongly marked with a judicial character.—*State* v. *Commissioners of Roads*, 1 Mills' Const. 55; *State ex. rel.* v. *Simons*, 2 Spears 761."

From the foregoing authorities and the nature, uses and objects of the remedy, it seems to me, to be a necessary conclusion, that the writ of prohibition lies from a superior court not only to inferior judicial tribunals properly and technically denominated such, but also to inferior ministerial tribunals possessing incidentally judicial powers or tribunals such as are known in the law as *quasi* judicial tribunals and even in extreme cases to purely ministerial bodies when they usurp judicial functions. When these latter abuse or exceed their legitimate powers, by the exercise of a jurisdiction that does not pertain to them, they may be restrained by prohibition. If this were not so there might be instances of the boldest and most wanton abuse of judicial power without an adequate remedy. This may be well illustrated by the case now before us. Assuming, for the present, that the county com-

missioners, the defendants here, are not a judicial body, but purely ministerial; then, it necessarially follows that they can have no power to examine witnesses and hear evidence for the purpose of reviewing the action of the precinct commissioners and determining whether or not the latter has received the votes of persons not legally entitled to vote. The authorities uniformly agree that the precinct commissioners act judicially in passing upon the right of persons to vote. The county commissioners then as a mere ministerial body have no power to review this judicial action, because to do so they must of necessity act judicially, as no ministerial officer or body, acting as such merely can review or set aside the conclusion or judgment of a tribunal acting judicially and within its jurisdiction. If then, these county commissioners do, as alleged and admitted in this case, undertake to hear such evidence and review the judgment of the precinct commissioners as to the right of particular persons to vote, they do not act ministerially but judicially. When they say they are a ministerial body, they admit they have no right to do what they persist in doing and what it is sought to prohibit them from doing. And when they are, in fact, acting judicially they seek to avoid control by prohibition by merely asserting what is denied by their acts, that they have no judicial power and are not acting as such. The law regards the fact and not the claim of contestants. The remedies afforded by it cannot be defeated by a mere denial of the right to do that which it is admitted is being done. If, therefore, the defendants have no judicial powers, as they now claim, then they admit they are doing what they concede they have no power to do. Their acts are, upon their own showing, a plain and willful usurpation of a power which does not belong to them. It cannot be questioned that a judicial body may be restrained by prohibition from exceeding the powers conferred upon it, or from manufacturing a jurisdiction which does not belong to it. Can it be contended then that the law is so defective or absurd that it cannot by the same means restrain any other tribunal, whatever may be its legitimate powers, from wholly usurping or manufacturing a jurisdiction and acting thereunder without a pretense of right, merely because it has no rightful judicial powers? I

am satisfied that the law tolerates no such absurdity. In my judgment, therefore, prohibition does lie to restrain the defendants here from acting in a judicial capacity beyond or in excess of the authority conferred upon them.

This brings us to the merits of this case, and that is, to determine whether or not the county commissioners have exceeded their legitimate powers? From what has been already said this does not involve the question, whether or not the said commissioners legitimately possess any judicial powers. But on this question, looking at the duties prescribed by the statute, there can be but little doubt.

The statute declares, that the commissioners "may require the attendance of the precinct commissioners or canvassers or other officers or persons present at the election, to answer questions under oath respecting the same, and may make such other orders as shall seem proper to procure correct returns and ascertain the true result of said election in said county." Acts 1882, chapter 155, section 21.

Under this act it is the duty of the county commissioners to determine, ministerially, the result, but necessarily, by the exercise of discretion and judgment. They must first determine that the ballots, poll-books and certificates before them are genuine, and that they are certified in form and manner substantially according to the requirements of the statute, to correct and put or have them put in form if they are not so, and that they are, in fact and in law, the returns of the election. This involves the exercise of a *quasi* judicial power. While the duties and powers of the commissioners are mainly ministerial, they are *quasi* judicial, so far as it is their duty to determine, whether the papers laid before them by the clerk and purporting to be returns, are in fact such genuine, intelligible, and substantially authenticated returns as are required by law. To the extent here indicated, a judgment in the nature of a judicial function is necessarily exercised; for, if it be otherwise, the whole law is inoperative in respect to the power of the county commissioners to do any act whatever. But aside from these limited judicial functions, the commissioners possess no discretionary powers, their duties are purely ministerial. On this subject the decisions of the courts of other States having statutes very similar to ours

. are uniform and explicit.   *Bloxham* v. *State-Canvassers*, 13 Fla. 55 ;  *O'Ferrel* v. *Colby*, 2 Me. 180 ;  *Mays* v. *Freeland*, 10 Mo. 630 ;  *Attorney General* v. *Barstow*, 4 Wis. 749 ;  *State* v. *Cann* 10 Iowa 343 ;  *People* v. *Vancleve*, 1 Mich. 362 ;  *Kisler* v. *Cameron*, 39 Ind. 488.

All the acts which the commissioners can do under the statute, must be based upon the returns.   Their final act and determination must be such as appears from, and is shown by, the returns from the several voting places of the county, to be correct.   They have no general power to issue subpœnas, to summon parties, to compel the attendance of witnesses, to grant a trial by jury, or to do any act, but determine and declare " the true result of the election " in the manner prescribed by the statute.   They are authorized to enter no judgment, and their power is limited by the express words of the statute, which gives them being, to the signing of a certificate containing the whole number of votes received by each person for each office, and therein declaring the result after " having carefully and impartially *examined the returns* of the election."   This certificate thus signed is not a judicial judgment, and the determination and declaration which they make is not a judicial declaration, that is, a determination of a right after notice, according to the general law of the land as to the rights of parties, but it is a declaration of a conclusion limited and restricted by the letter of the statute.   *Drew* v. *State, &c.*, 26 Fla. 17, 44.

The twenty-second section of the statute, which immediately succeeds the section before quoted, expressly directs and enjoins that the commissioners " shall carefully and impartially ascertain the result of the election  *  *  *  *under the regulations prescribed in the next preceding section."*  This confines and limits them to the mode prescribed and the powers given them in the preceding section, which is the one we have been considering.   By that, as we have seen, they have no authority to go beyond or behind the returns.

That said section twenty-one does not authorize the commissioners to go behind the returns and hear evidence to reject the votes of persons whose votes had been received and returned by the precinct commissioners, has not been seriously, if at all, questioned by the defendants in error here,

but the right to do so, it is earnestly claimed, is conferred upon the commissioners by section twenty-six of said statute, which is as follows :

" 26. Though illegal votes be received, or legal votes rejected at any place of voting, the returns of the votes taken at such place shall not be set aside for that cause, but it may be shown by proper evidence *before the final judges of election* for whom such illegal votes, or any of them were cast, or for whom such legal votes which were rejected would have been given, and so far only as is so shown the returns shall be corrected." Acts 1882, ch. 155, p. 500.

The section immediately preceding this one is as follows :

" 25. In all contested cases the county court shall be the judge of the election, qualification, and return of its own members, and of all county and district officers." And chapter 103 of the same acts provides for proceedings in all cases of contested elections and who shall be the judges in such contests.

I do not deem it necessary to trace the origin and history of the election laws of Virginia and this State, as was done in the argument, in order to show that said twenty-sixth section has reference alone to tribunals authorized to hear and determine contested elections, and that the words, " final judges of elections," used therein mean the tribunals fixed by law for hearing and determining contested elections and not the commissioners of the county court sitting in special session to ascertain the result of an election. A mere cursory examination of the statutes will be sufficient, it seems to me, to satisfy any unbiased mind that the powers therein conferred were never intended to be exercised by a mere returning board without notice to parties or any of the powers necessary to compel the attendance of witnesses, a body, as we have seen, that has no judicial powers except those of the most limited character, scarcely any more than those exercised by almost all ministerial bodies. It is admitted, and such is the fact, that this is not a new section of the statute and that it was never claimed, as it formerly stood, to apply or refer to the board whose place is now occupied by the county commissioners acting as commissioners of election, but that it applied and referred to those boards or bodies in-

vested with the power to pass upon contested elections. The present claim is founded entirely upon the position this section occupies in the classification and division of the statutes. Formerly the provisions concerning both elections and contests were in the same chapter, but in the revision of 1882, the legislature divided these subjects into two chapters; and simply because this section is placed in the chapter on elections, it is claimed that the legislature intended to change its effect and transfer the powers therein conferred, from the final judges in contested elections to the county commissioners sitting as commissioners of election. According to this contention the twenty-fifth section hereinbefore given, is without effect anywhere, because it plainly relates not to elections but contests. But however this may be, it is certain that this alleged intention to change the operation of the statute arises, if it does arise, merely by implication. If the legislature had intended to make such a radical, unnecessary and dangerous alteration in the law by giving such a tremendous and far-reaching power, a power plainly judicial in its character, to a board of commissioners, whose duties have always been mainly ministerial and possessed of none of the machinery or adjuncts of a judicial tribunal, it is reasonable to presume that it would not have left its intention to mere implication, but would have put it in strong and express terms. Nor will the courts readily make such an implication in the face of dangers so apparent and destructive of the elective franchise. The opportunities for, the dangers of, and the temptations to, a lawless, wilful or corrupt determination of the result of an election, are greatly increased if the commissioners may go outside of the returns and determine according to their own " sweet wills," and upon such testimony as they may choose to admit, the rights of adverse candidates to office. And so as the powers of the commissioners are enlarged and the danger from their exercise is increased, is all redress and right of revision of their action taken away. They are thus by mere implication made an inferior judicial tribunal with a jurisdiction of the most perilous import, deciding issues affecting the integrity of the elective franchise which is the foundation of republican institutions and free government itself; and yet a tribunal which keeps no record of its pro-

ceedings and from whose judgments there lies no writ of error or appeal. A parallel for such a tribunal could only be found in the universally condemned returning boards of 1876 in Louisiana, Florida and South Carolina.—*Drew* v. *State, &c.,* 26 Fla. 17.

Suppose these county commissioners, under this twenty-sixth section, reject or receive enough votes to alter the result of the election, on the ground that such votes had been illegally received or rejected by the precinct commissioners, and thus force the party whom the face of the returns shows to have been elected to a contest, how will it be possible for such contestant to show that the county commissioners improperly rejected or received such votes? They are not required, even if they are permitted, to keep a record of their action in such matter; nor are they authorized to strike from or add to the lists of voters certified to them from the several voting places. Thus there will be no evidence or means of showing the names of the persons whose votes they rejected or received, unless we can presume they themselves can recollect such names and are willing to furnish them. If the commissioners acted honestly they may give the correct information, but if they acted corruptly, as we know such boards have done, it would be contrary to all experience to assume or expect that they would voluntarily expose their corruption. Such a board or body, by illegally rejecting votes and thereby disfranchising electors, commits a most serious offence, an offence which strikes at the very foundation of our system of government, and which cannot be too severely condemned. He who, by fraud or by willful disregard of his sworn duty, defeats the will of the people as expressed by their votes, commits a political crime next to treason and nearly akin to it, and it would be hardly a less crime for a legislature by an express enactment, or a court by implication, to offer the means and temptation for the commission of such a crime. *McDill* v. *The State Canvassers,* 36 Wis. 498. It is not to be believed that a body, or any member of it, guilty of such an offence would, under the most rigid compulsion, much less willingly, admit it. Yet they would be the only resort of the contestant in such case to establish his right to the office of which he was thus wantonly and illegally deprived.

If the contention of the defendants in error be sustained, it seems to me, the elective franchise in this State would be seriously endangered it not made a mere farce. Such tremendous power, unguarded and unrestrained, in the hands of an irresponsible body whose members are the sole custodians of its rulings and actions, and which, if not wilfully and wantonly corrupt, is almost always composed of persons unlearned in the law and unacquainted with the rules of evidence and often made the dupes of designing persons, would destroy all confidence in the result of elections and produce unrest in the people, and, perhaps, end in the condemnation of our system of republican government. This Court most unhesitatingly declines to evoke the grant of such power by mere implication or construction of statutes. For the foregoing reasons the order of the judge of the circuit court is reversed with costs to the plaintiffs in error against the defendants in error other than the commissioners of the county court, the rule awarded by said judge is made absolute and the writ of prohibition directed to issue from this Court to restrain and prohibit the commissioners of the county court from transcending their legitimate powers by going behind the returns of the election and examining witnesses and hearing evidence as to the legal right of any persons to vote, whose votes are certified as having been received by the precinct commissioners at any of the several voting places in the county, or from receiving any votes that were rejected by said precinct commissioners; and that the defendants recover their costs incurred in the prosecution of the proceedings had before the said circuit judge.

REVERSED AND PROHIBITION AWARDED.