STATE *ex rel.* NAAMAN JACKSON BARKER

*v.*

A. JAMES MANCHIN, SECRETARY OF STATE

OF THE STATE OF WEST VIRGINIA, *respondent*, AND

THE LEGISLATIVE RULE-MAKING REVIEW COMMITTEE,

ROBERT M. STEPTOE AND WILLIAM E. SHINGLETON,

CO-CHAIRMEN, *intervenors.*

(No. 14584)

Decided June 15, 1981.

*Daniel F. Hedges* and *David R. Wooley* for relator.

*Chauncey H. Browning,* Attorney General, *Victor A. Barone,* Deputy Attorney General, for respondent.

McGRAW, JUSTICE:

The relator, Naaman Jackson Barker, a resident and citizen of West Virginia employed as a surface miner in or near Logan County, West Virginia, seeks a writ of mandamus under the original jurisdiction of the Court to compel the respondent, A. James Manchin, Secretary of State of West Virginia, to file in the permanent register of rules certain rules and regulations promulgated by the Director of the Department of Mines governing the safety of persons employed in and around surface mines operated within the state so that they will be in force and effect and can be enforced as contemplated and required by law. The

relator contends that the provisions of the West Virginia Administrative Procedures Act, particularly W.Va. Code §§ 29A-3-11 and 29A-3-12 (1980 Replacement Vol.), pursuant to which the rules in question were disapproved by the Legislative Rule-Making Review Committee, are unconstitutional and void and that the respondent, therefore, has a nondiscretionary duty to file the rules and regulations in the permanent register. We conclude that the relator's arguments are meritorious, and we award the writ.

The facts of the case are not in dispute. In 1967 the Legislature, in enacting surface mining and reclamation legislation, provided that the Director of the Department of Mines "shall promulgate reasonable rules and regulations, in accordance with provisions of chapter 29A . . . of said Code, to protect the safety of those employed in and around surface mines, and the enforcement of all laws, and rules and regulations relating to the safety of those employed in and around surface mines is hereby vested in the department of mines." W. Va. Code § 20-6-20 [1967]. In 1979, before this litigation was commenced, the Legislature amended chapter 20, article 6 of the Code, manifesting the intent that the Department of Natural Resources and the Department of Mines were to cooperate in the promulgation of rules and regulations relating to the mining industry. W.Va. Code § 20-6-1 [1979]. In 1980, after the commencement of these proceedings, the Legislature amended the state's surface mining and reclamation laws to reflect its intention that safety in and around surface mining operations be the responsibility of the Department of Mines.[1] W. Va. Code § 20-6-34 (1980 Cum.Supp.) provides:

---

[1] The 1980 amendments to the surface mining and reclamation laws were passed with the proviso that they would become effective upon a proclamation of the governor finding that the approval of the West Virginia state program under § 503 of the Surface Mine Control and Reclamation Act of 1977, 30 U.S.C.A. § 1201 *et seq.*, has been given by the Secretary of the United StatesDepartment of the Interior. That proclamation was issued on January 15, 1981, and became effective on ·January 19, 1981. Executive Order No. 1-81 (January 15, 1981). Until that date, the 1979 amendments remained in effect.

". . .The director of the department of mines shall promulgate reasonable regulations in accordance with the provisions of chapter twenty-nine-A [§ 29A-1-1 et seq.] of this Code to protect the safety of those employed in and around surface mines. The enforcement of all laws and regulations relating to the safety of those employed in and around surface mines is hereby vested in the department of mines and shall be enforced according to the provisions of chapter twenty-two [§22-1-1 et seq.] of this Code."

The Legislature also charged the Department of Mines with certification and training of persons responsible for blasting or the use of explosives in surface mining, W.Va. Code § 20-6-34 (1980 Cum.Supp.), and with promulgating rules and regulations concerning the certification of surface mine foremen. W.Va. Code § 20-6-36 (1980 Cum.Supp.). This brief summary of legislation, before and after the commencement of the pending mandamus proceeding, clearly affirms the position of the relator that the Department of Mines is required by law to promulgate rules and regulations relating to personnel safety in and around surface mining operations.

During this period, the Legislature revised the West Virginia Administrative Procedures Act, Chapter 29A of the West Virginia Code, in an attempt to maximize public participation in administrative rule-making. 1976 W.Va. Acts, ch. 117. *See generally* Neely, *Rights and Responsibilities in Administrative Rule-Making in West Virginia*, 79 W. Va. L. Rev. 513 (1977) [hereinafter cited as *Neely*]. The 1976 amendments did not alter the portion of the Act which provides that lawfully adopted rules and regulations of administrative agencies of the State shall be of no legal force and effect unless they are filed in the permanent register in the office of the Secretary of State, who is responsible under the law for the maintenance of the register and for the reception and official filing of rules and regulations therein. W.Va. Code § 29A-2-1 (1980 Replacement Vol.). As part of the revision, however, a new legislative body was created, the Legislative Rule-Making Review Committee, the constitutional validity of which is

at issue here. W. Va. Code § 29A-3-11 (1980 Replacement Vol.).[2]

---

[2] W. Va. Code § 29A-3-11 reads in pertinent part:

(a) There is hereby created a statutory body to be known as the legislative rule-making review committee, to review all rules or regulations of the several agencies following the proposal thereof, except those rules or regulations described in subsection (a), section seven [§ 29A-3-7] of this article. The committee shall be composed of six members of the senate, appointed by the president of the senate, and six members of the house of delegates, appointed by the speaker of the house of delegates. In addition, the president of the senate and the speaker of the house of delegates shall be ex officio nonvoting members of the committee and shall designate the co-chairmen. Not more than four of the voting members of the committee from each house shall be members of the same political party. . . . The committee shall meet upon call of the cochairmen and may meet at any time, both during sessions of the legislature and in the interim.

(b) No adoption, amendment or repeal of any rule or regulation, except a rule or regulation described in subsection (a), section seven [§ 29A-3-7] of this article or a rule or regulation issued pursuant to section fourteen [§ 29A-3-14] thereof, shall be effective until seventeen copies thereof have been presented to the legislative rule-making review committee by the agency proposing such rule or regulation at a regular meeting of said committee, and approved by the committee. The form of proposed rules or regulations which are presented to the committee shall be as follows: New language shall be underlined and language to be deleted shall be stricken-through but clearly legible. The committee shall study all proposed rules or regulations and, in its discretion, may hold public hearings thereon.

Within six months after the proposed rule or regulation is presented to the committee, the committee shall either approve, approve in part and disapprove in part, or disapprove the proposed rule or regulation and file notice of its action in the state register and with the agency. In the event no notice of approval or disapproval is filed by the committee in the state register within one hundred eighty days afer the presentation of the proposed rule or regulation to the committee, the committee shall be deemed to have approved all of the proposed rule or regulation for the purposes of this section. To the extent that a proposed rule or regulation is approved by the committee it shall be effective thirty days after the filing of notice of approval or on the effective date proposed by the agency, whichever is later, or if no notice is filed, thirty days after approval is deemed to have occurred for the purposes of this section. The secretary of state shall note every such effective date in the state register. To the extent that the committee disapproves a proposed rule or regulation no agency shall thereafter issue any regulation or directive or take other action to implement such disapproved rule or regulation except that the

Briefly, section 11 of the Administrative Procedures Act provides that no agency rule or regulation shall become effective until it has been presented to and approved by the Committee. The Committee is composed of six members of the Senate and six members of the House of Delegates, appointed by the President of the Senate and the Speaker of the House of Delegates, respectively, who also act as ex officio non-voting members. The Committee has six months after the presentation of the proposed rule or regulation within which to approve or disapprove, in whole or in part, the proposed agency action. If the Committee fails to act on proposed rules and regulations within that time period, it is deemed to have approved all of the proposed regulation. Barring action by the Legislature as a whole, approved regulations become effective after thirty days. Disapproved regulations are invalid and may not be implemented by the agency unless the full Legislature reverses the Committee disapproval.

Under the provisions of W.Va. Code § 29A-3-12 (1980 Replacement Vol.), the Committee is required to submit to the Legislature copies of the rules and regulations it has considered at least thirty days before the end of each regular session. The rules and regulations are referred to the appropriate committes of the Legislature for study. Committee hearings are required to be held on rules and regulations disapproved in whole or in part by the Legislative Rule-Making Review Committee.

> [T]he legislature *may* by concurrent resolution either sustain or reverse, in whole or in part, the action of the legislative rule-making review committee under the provisions of section eleven, *except* that *if the legislature fails during its regular session to sustain by resolution the disapproval of*

---

legislature may reverse such disapproval under the provisions of section twelve [§ 29A-3-12] of this article. If the committee disapproves any rule or regulation proposed for the purpose of implementing a federally subsidized or assisted program the legislature shall either sustain or reverse every such disapproval.

(c) Any rule or regulation described in subsection (a), section seven [§ 29-A-3-7] of this article shall be effective thirty days after filing in the state register.

*a rule or regulation proposed for the purpose of implementing a federally subsidized or assisted program, such disapproval shall be deemed reversed* for purposes of this section and the proposed rule or regulation shall become effective . . . (emphasis added). W.Va. Code § 29A-3-12.

The language of this statute implies that the action of the Committee is a recommendation to the Legislature. Theoretically, the Committee's action is only a starting point for review by the full Legislature. However, while the statute contemplates such review, it clearly does not require it. While the Legislature "may" approve or disapprove the Committee recommendation, it is not required to. In only one instance is formal action by the Legislature required in order to validate the Committee action. If the Committee disapproves a rule designed to implement "a federally subsidized or assisted program," then such disapproval must be formally sustained. W.Va. Code § 29A-3-11. In this instance alone, inaction by the full Legislature is "deemed" to reverse the Committee. W.Va. Code § 29A-3-12. Presumably, in all other cases, inaction by the Legislature constitutes tacit approval of the Committee action. Thus, in all areas except federal aid programs, there is no formal requirement for review of the Committee's action. Its decisions stand on their own and serve as a final "veto" of any disapproved rule.

The surface mine safety rules and regulations here in issue were adopted by the Department of Mines and transmitted to the Secretary of State in January of 1979. Notice of opportunity for interested persons to submit data and proposed amendments to the rules and regulations was given and a date for a public hearing was set in compliance with W. Va. Code §§ 29A-3-8 and 9 (1980 Replacement Vol.). When finally adopted with amendments, the rules and regulations were transmitted to the Secretary of State and to the Legislative Rule-Making Review Committee on April 23, 1979. At the Committee's meeting on June 25, 1979, the proposed surface mine safety rules and regulations were considered and, after discussion, were disapproved. The relator, a citizen of West Virginia and a surface miner,

brought this action in mandamus to compel the respondent to file the proposed surface mine safety rules in the state register as final rules having full force and effect of law, contending that the Legislative Rule-Making Committee and the Legislature, acting pursuant to the provisions of W. Va. Code §§ 29A-3-11 and 12, have unconstitutionally prevented the Department of Mines from promulgating and implementing valid surface mine safety regulations as required by law.

The respondent, in his verified answer, interposes eight defenses, including the assertion that the statutory creation of the Legislative Rule-Making Review Committee is constitutional and was warranted by past abuses of administrative agencies. The Legislative Rule-Making Review Committee, Robert M. Steptoe and William E. Shingleton, as Co-Chairmen and as citizens and taxpayers, permitted on their motion to intervene in the ligitation, set out six defenses in their verified answer, adopting and supporting generally the defenses interposed by the respondent. The West Virginia League of Women Voters, particularly manifesting interest in the effect of these review procedures on the promulgation of rules and regulations of the West Virginia Air Pollution Control Commission, appeared in the proceedings to file a brief as *amicus curiae*.

Several of the issues raised by the respondent and the intervenors can be disposed of briefly. The first and second defenses interposed by the respondent and the intervenors were that strict proof would be required to clarify some of the relator's allegations and that the petition fails to set forth sufficient facts upon which relief can be granted. Consistent with Rule XVIII of this Court's Rules of Practice then in effect, the relator, in his petition, indicated the belief that the taking of evidence in the original jurisdiction proceedings would not be necessary. The petition adequately sets forth facts sufficient in quantity and substance to state a justiciable controversy. In view of the record development and the extensive briefs and arguments of counsel, we think the controlling and

determinative issues in this proceeding can well be decided without further factual developments.

The respondents and the intervenors also contend that the case is moot for the reason that the surface mine safety rules and regulations have already been filed and recorded in the state register by operation of law and that the relief sought in the petition for a writ of mandamus already exists. They further contend that the petition fails to allege that the "rules and regulations in question ... [have] become effective in any form." A perusal of the materials presented discloses that the proposed rules have been filed and classified as "obsolete". The relief requested is that they be filed as "final" and "in force and effect." The claim that the relief sought has been granted is specious on its face. The respondent and the intervenors admit that the proposed rules which are the subject of this litigation were disapproved by the Committee. The record discloses no reversal of the disapproval by the Legislature as a whole. Accordingly the statute on which the intervenors and the respondent rely prohibits the proposed rules from becoming effective and being implemented. Even if that were not so, the controversy would not be rendered moot. The case presents a situation where rights of parties such as the petitioner could be compromised repeatedly under numerous variations of a recurring factual pattern. The need for a definitive resolution is apparent. *See, e.g., Walls v. Miller*, 162 W.Va. 563, 251 S.E.2d 491 (1978); *State ex rel. Browning v. Blankenship*, 154 W. Va. 253, 175 S.E.2d 172 (1970).

The next contention is that mandamus is not a proper remedy in this case and that the relator has an adequate remedy at law in the form of a declaratory judgment action. In syllabus point 3 of *State ex rel. Greenbrier Airport Authority v. Hanna*, 151 W. Va. 479, 153 S.E.2d 284 (1967), the court stated:

> "Mandamus lies to require the discharge by a public officer of a nondiscretionary duty."

In *State ex rel. Hall v. County Court of Monongalia County*, 82 W. Va. 564, 96 S.E. 966 (1918), the following language appeared:

[T]o preclude the right to resort to mandamus, such other remedy, when otherwise appropriate, must be adequate and equally well adapted to right the wrong complained of. If it be incomplete or less direct and effective, the court may in the exercise of a sound discretion either grant or refuse the writ. In *Pipeline Co. v. Riggs*, 75 W.Va. 353, 356 [83 S.E. 1020, Ann. Cas. 1918A, 995], there was, as it. appears, a clear and express remedy given by statute to compel a sheriff to pay county orders lawfully drawn upon him, yet the common law coercive writ was upheld because more convenient, direct, beneficial and efficient. When these elements concur, mandamus is proper as a mode of redress, although there may be another legal remedy for the same wrong. [citations omitted]. 82 W.Va. at 568, 96 S.E. at 967.

The precise reasons for the granting of the writ due to "inadequacy" of other remedies was further expanded upon by Justice Neely in *Walls v. Miller, supra.* Quoting from his opinion:

"The trend in this Court has been to enlarge the scope of mandamus. *State ex rel. Smoleski v. County Court of Hancock County*, 153 W. Va. 307, 168 S.E.2d 251 (1969) especially where there is *an urgent question of public policy or where there is no reason for delaying adjudication of the issue by the highest court of the state.* (emphasis added; footnote deleted.)

\* \* \*

[We] find in the case before us that the alleged deprivations of petitioner's rights are capable of being repeated under numerous variations of a basic recurring factual pattern, in spite of all other available administrative and legal remedies if no definitive resolutions of these issues are provided by this Court. [footnote omitted.] Accordingly we hold that we have before us sufficient factual stipulations to permit us to adjudicate the three issues raised in the petition, and that there is *no sound reason for declining to grant extraordinary relief.* (emphasis added) 251 S.E.2d 491, 495-496.

Under the criteria set forth in *Walls* and *Hall, supra,* and in view of our resolution, *infra,* of the constitutional question presented, we conclude that declaratory judgment proceedings under the Administrative Procedures Act or otherwise under the law would not be as effective in these circumstances and do not preclude resort to mandamus for adjudication of the issues in this litigation. *See also State ex rel. Maloney v. McCartney,* 159 W. Va. 513, 223 S.E.2d 607 (1976); *State ex rel. West Virginia Housing Development Fund v. Copenhaver,* 153 W. Va. 636, 171 S.E.2d 545 (1969).

The respondent has also questioned the standing of Mr. Barker to seek relief in this case. The crux of this argument is that the relator has shown no "direct injury" such as was traditionally required under cases such as *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). This point is not well taken. This Court rejected this strict standard in the case of *State ex rel. Brotherton v. Moore,* 159 W. Va. 934, 230 S.E.2d 638 (1976), where it was stated in syllabus point 1 that:

"A citizen and taxpayer of this State has a right to a mandamus proceeding in order to compel a public official to perform a non-discretionary constitutional duty."

We specifically stated that no "special or pecuniary interest must be shown by individuals who sue in this capacity." 230 S.E.2d 638, 640-641. *See also State ex rel. Brotherton v. Blankenship,* 158 W. Va. 390, 214 S.E.2d 467 (1975); *Delardas v. County Court,* 155 W. Va. 776, 186 S.E.2d 847 (1972); *Frantz v. County Court,* 69 W. Va. 734, 73 S.E. 328 (1911). In the present case the relator, in addition to being a citizen and taxpayer, is a coal miner on a surface mine operation. He is a citizen who would be most directly affected by the safety regulations involved here. There is no legitimate question concerning the sufficiency of his personal interest to bring this suit.

The respondent and the intervenors also contend that the petition fails to join an indispensable party, the Director of the Department of Mines. The best that can be said

of the precise definition of "indispensable parties" is that in West Virginia "[t]here is no precise or universal test to determine when a person's interest is such as to make him an indispensable party." *Dixon v. American Industrial Leasing Co.*, 157 W. Va. 735, 740, 205 S.E.2d 4, 7 (1974). Based upon the somewhat loose criteria in *Dixon,* and after careful consideration of the concerns of the respondent and the intervenors, we conclude that the Director's presence is not critical to the disposition of the case before us. He is an interested and concerned party, but in the context of this litigation he is not a necessary or indispensable party. *Dixon v. American Industrial Leasing Co., supra.*

Finally it is contended that this suit presents a political question not subject to judicial treatment in that we are asked by the relator to implement a specific policy. Our determination of the issues in this case does not represent a political policy choice by the Court. Indeed, for our purposes the specific content of the rules in question is immaterial. What we are asked to decide is whether the disapproval by the Legislature of these or any other administrative rules and regulations, which have been validly promulgated by an administrative agency pursuant to statutory authorization, by means of a statutory scheme of legislative veto power is inconsistent with fundamental principles embodied in our constitution. Thus, even though political issues may appear on the record, the questions for our determination are clearly justiciable.

Having disposed of the preliminary issues and defenses raised in the case, we turn our attention to resolution of the major issue presented for our determination: Whether W. Va. Code §§ 29A-3-11 and 12, which provide for the review and disapproval of otherwise validly promulgated administrative rules and regulations by the Legislature through its Legislative Rule-Making Review Committee are unconstitutional as violative of the separation of powers doctrine embodied in article V, section 1 of the Constitution of West Virginia.

Article V, section 1 of the state constitution provides:

"The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature."

This constitutional provision which prohibits any one department of our state government from exercising the powers of the others is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed. *State ex rel. State Building Comm. v. Bailey*, 151 W. Va. 79, 150 S.E.2d 449 (1966); *State v. Huber*, 129 W. Va. 198, 40 S.E.2d 11 (1946); *Sims v. Fisher*, 125 W. Va. 512, 25 S.E.2d 216 (1943). Where one branch of our state government seeks to exercise or to impinge upon the powers conferred upon another branch, we are compelled by this mandate to restrain such action, absent a specific constitutional provision permitting such interference.[3]

---

[3] There are some examples of constitutionally-approved intrusions into the legislative sphere by the executive which are worth noting here. The governor, the chief executive of the State, is required to prepare and submit to the Legislature a budget, W. Va. Const. art. VI, § 51, and is empowered to convene the Legislature, W. Va. Const. art. VI, § 19, to call extraordinary sessions, W. Va. Const. art. VII, § 7, and to veto bills, W. Va. Const. art. VII, §§ 14, 15.

A particularly interesting, even intriguing, constitutional intrusion by the executive on the legislative power is the Citizens Legislative Compensation Commission, established by W. Va. Const. art. VI, § 33. It is designed to breathe due process into the establishment of fair and proper legislative salaries. The Commission, whose members are appointed by the governor, is required to submit to the Legislature a resolution, delineating the compensation and expense allowances to which the Commission has determined the members of the Legislature are entitled in the performance of their duties. The Commission must hear evidence of proper standards of pay for comparable constitutional officers in this and other jurisdictions, must make findings of fact with respect to the salaries of these constitutional officers and must recommend, based upon these findings, a proper level of compensation for legislative service in West Virginia. Failure

The powers and duties of each of our three branches of government are set forth in the constitution. Powers and responsibilities of the Legislature are detailed in article VI. Article VII relates to the powers and duties of the Executive Department and article VIII defines the powers and responsibilities of the Judicial Department. Generally speaking, the Legislature enacts the law, the Governor and the various agencies of the executive implement the law, and the courts interpret the law, adjudicating individual disputes arising thereunder. W. Va. Const. art. VI, §1; art. VII, § 5; art. VIII, § 1. The relator here contends that the Code provisions relating to the authority of the Legislative Rule-Making Review Committee to disapprove proposed agency rules and regulations and of the entire Legislature to do so by concurrent resolution offends the doctrine of separation of powers by permitting the Legislature to exercise power properly belonging to the Executive Department.

Our state constitution imposes certain mandatory duties upon the Legislature. For example, article XII, section 1 provides that "[t]he legislature shall provide, by general law, for a thorough and sufficient system of free schools." *See Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979).[4] As a general rule, however, the Legislature has plenary power to act unless prohibited from doing so by the constitution itself. *State ex rel. County Court v. Demus*, 148 W. Va. 398, 135 S.E.2d 352 (1964); *Kanawha County Public Library v. County Court*, 143 W. Va. 385, 102 S.E.2d 712 (1958); *Ex parte Stratton*, 1 W. Va. 305 (1865). The police power of the State is broad and sweeping and the Legislature, as its depository, may delegate to the Executive, within certain limits, its power to enact rules and regulations for the protection of the public welfare, health and safety which have the force of law. *Mountaineer Disposal Service, Inc. v. Dyer*, 156 W. Va. 766, 197 S.E.2d 111 (1973); *State ex rel.*

---

by the Commission to fulfill its constitutional responsibilities would subject it to judicial review and mandate.

[4] *See also* W.Va. Const. art. II, § 4; art. IV, §§ 8, 11, 12; art. VI, §§ 10, 24, 27, 36, 39, 45, 46, 48, 49, 51; art. VIII, §§ 3, 5; art. IX, §§ 5, 6, 13; art. X, § 5; art. XI, §§ 1, 4, 10; art. XII, §§ 4, 5, 12.

*Morris v. West Virginia Racing Comm.*, 133 W. Va. 179, 55 S.E.2d 263 (1949). The Legislature may not vest uncontrolled discretion in the Executive to promulgate rules and regulations, but must provide the Executive with sufficient standards or policy for guidance. *Reinhart v. Woodford Flying Service*, 122 W. Va. 392, 9 S.E.2d 521 (1940). Of course, the Legislature in its wisdom may choose to grant no rule-making power at all to an agency or to grant such power to only a few agencies. There is no allegation here that the delegation of the rule-making power to the Department of Mines was invalid as not being within these limitations.

The Governor, as the chief executive of the State, is the head of the Executive Department. W. Va. Const. art. VII, § 5. In that capacity he is empowered to appoint all officers "whose offices are established by this Constitution, or shall be created by law, and whose appointment or election is not otherwise provided for; and no such officers shall be appointed or elected by the legislature." W. Va. Const. art. VII, § 8. Officers appointed by the Governor to administrative offices are officers of the Executive Department. The Governor also has the power to veto enactments of the Legislature. W. Va. Const. art. VII, § 14.

When the Legislature delegates its rule-making power to an agency of the Executive Department, as it did here by requiring the Director of the Department of Mines to promulgate surface mine safety rules and regulations, it vests the Executive Department with the mandatory duty to promulgate and to enforce rules and regulations. Once the executive officer or agency has made and adopted valid rules and regulations pursuant to the grant of the legislative powers, they take on the force of statutory law. *See* 2 Am.Jur.2d, *Administrative Law* §§ 292-295 (1964). Under the provisions of the 1976 revision of article 3 of the Administrative Procedures Act, however, rules and regulations of administrative agencies become effective only upon compliance with the provisions of the Act, including § 29A-3-11, creating and granting authority to disapprove regulations to the Legislative Rule-Making Review Committee, and § 29A-3-12, relating to the action of the entire

Legislature on the Committee's report. W. Va. Code § 29A-3-3 (1980 Replacement Vol.). Thus, even though an executive officer or agency has fulfilled its duty by drafting and approving otherwise valid regulations pursuant to a delegation of the legislative rule-making power, the statute precludes the regulations from taking effect and prevents such officer or agency from implementing those measures until they are approved by the Legislature or a portion of its membership. No standards are provided for the review of rules and regulations by the Legislature. A twelve-member committee may, in its discretion, approve or disapprove, in whole or in part, any proposed administrative rules and regulations. The Committee may in fact attempt to influence or dictate the content of the rules and regulations of an executive agency, separate and distinct from the Legislative Department.[5] The entire Legislature may, at some later date, sustain or reverse the action of the Committee by concurrent resolution. Inaction by the Legislature validates the Committee's disapproval of rules and regulations and precludes their implementation by the Executive Department. The power of a small number of Committee members to approve or to disapprove otherwise validly promulgated administrative regulations, and of the entire legislative body to sustain or to reverse such actions either by concurrent resolution or by inertia, constitutes a legislative veto power comparable to the authority vested in the Governor, as head of the Executive Department, by W. Va. Const. art. VII, § 14, and reverses the constitutional concept of government whereby the Legislature enacts the law subject to the approval or the veto of the Governor.

As we noted before, our constitution places strict procedural and substantive limitations upon the power of

---

[5] *See*, Schubert, *Legislative Adjudication of Administrative Legislation*, 7 J. Pub. Law 134, 157-158 (1958):

"It would doubtless be unrealistic to assume that a group of state legislators would be content to make judgments about the *legal* power of administrative agencies, and ignore the *political* implications of administrative policies as these are revealed in actual application in specific instances. Legislative review of administrative rule-making is almost certain, in the United States, to be *political* review." (Emphasis added.)

the Legislature to enact law. The constitution outlines the procedure for exercising legislative power. This language is a self-contained standard to which all enactments must conform. If the passage of a purported law has not strictly conformed with the standards, it is void. The magic gantlet is spelled out in article VI and VII of the constitution.

Article VI, section 1 vests the Senate and the House of Delegates with the legislative power and requires enactments to be styled, "Be it enacted by the Legislature of West Virginia.". "Bills and resolutions may originate in either house, but may be passed, amended or rejected by the other." W.Va. Const. art. VI, § 28. Section 29 of article VI prohibits a bill from becoming law "until it has been fully and distinctly read, on three different days, in each house . . .", except in cases of urgency. No act of the Legislature may embrace more than one object, which must be expressed in the title of the act, nor may any law be revived or amended by reference only to its title. W.Va. Const. art. VI, § 30. Article VI, § 31 provides for the passage of amended bills or resolutions upon the affirmative vote of a majority of the house in which the bill or resolution was originally passed. Additional procedures for the passage of budgetary items and appropriations bills are set out at length in article VI, § 51 and its subsections. Before any bill passed by the Legislature can become law, it must be submitted to the Governor for his approval. If the Governor disapproves the bill, it is returned first to the house in which it originated and then to the other house. The Governor's veto may be overriden by a majority vote of the members of both houses. W. Va. Const. art. 7, § 14. Detailed procedures for the Governor's veto or approval of appropriations bills are set forth in article VI, section 7 and article VII, section 15.[6]

---

[6] Other constitutional limitations on the Legislature's power may be found in article VI, section 39 (no special or local laws), article VI, section 39(a) (no special law incorporating cities, towns or villages or amending their charters), article VI, section 40 (Legislature may not confer power of appointment upon court or judge), and article VI, section 42 (appropriations bills for legislators' salaries shall contain no provision on any other subject).

These constitutional provisions clearly limit the power of the Legislature to give the binding effect of law to its actions. It may create law only by following the formal enactment process. Where it seeks to give legal force to informal actions, the Legislature exceeds the limits of its constitutional authority. Thus, it has been held from the earliest days of our statehood that the Legislature cannot give a matter the force and effect of law by joint resolution when such matter is properly the subject of the enactment process. *Boyers v. Crane*, 1 W. Va. 176 (1865). Joint or concurrent resolutions, while they may bind the members of the legislative body, are not statutes and do not have the force and effect of law. *See Newport News Fire Fighters Asso., etc. v. Newport News*, 307 F.Supp. 1113 (E.D.Va. 1969); *Boyer-Campbell Co. v. Fry*, 271 Mich. 282, 260 N.W. 165 (1935); *Moran v. LaGuardia*, 270 N.Y. 450, 1 N.E.2d 961 (1936); *S.H. Hawes & Co. v. Wm. R. Trigg Co.*, 100 Va. 165, 65 S.E. 538 (1909); 73 Am.Jur.2d *Statutes* § 3.

Of course, when an administrative agency promulgates rules and regulations pursuant to a grant of power by the Legislature, it is not limited by the constitutional restraints on legislative action. The constitutional limitations outlined above apply only to the legislative branch of our government. Moreover, since the executive cannot be delegated plenary rule-making power but must adhere to legislative guidelines in promulgating regulations, such restraints are less critical to control the exercise of that power by the executive. Thus, so long as it acts within the limits of the legislative grant of rule-making power, the executive may properly make rules having the force and effect of law without following the constitutional enactment procedures required of the Legislature when it exercises its law-making power.

What the Legislature has attempted to do here is to invest itself with the power to promulgate rules having the force and effect of law outside the constitutional limitations imposed upon the legislative branch in the exercise of that power. In effect, the Legislature abdicates in favor of the executive its power to make rules and then asserts that because the rule-making power so delegated is legislative

in nature, it may step into the role of the executive and disapprove or amend administrative regulations free from the constitutional restraints on its power to legislate. The statutory scheme brings to mind the Old Testament quotation from Job I:21, "The Lord gave, and the Lord hath taken away." The legislature at one time created and delegated powers and responsibilities to the Department of Mines and at a later time attempted to take away some of those important powers and responsibilities and to lodge them in the hands of the Legislature and its personnel. Such a mechanism for legislative review of executive action may properly be called an "extra-legislative control device" for it permits the Legislature to act as something other than a legislative body to control the actions of the other branches. This is in direct conflict with our constitutional requirement of separation of powers. The power of the Legislature in checking the other branches of government is to legislate. *State v. Harden*, 62 W. Va. 313, 58 S.E. 715 (1907). While the Legislature has the power to void or to amend administrative rules and regulations, when it exercises that power it must act as a legislature through its collective wisdom and will, within the confines of the enactment procedures mandated by our constitution. It cannot invest itself with the power to act as an administrative agency in order to avoid those requirements.

Other jurisdictions have reasoned in a similar manner to reach the conclusion that a legislature may not act informally to check the activities of the other branches of government. Most recently, the Supreme Court of Alaska, in *State v. A.L.I.V.E. Voluntary*, 606 P.2d 769 (Alaska 1980), reviewed the provisions of the Alaska Constitution setting out the procedural requirements for formal legislative action. Recognizing the legal force of rules and regulations, the court reasoned that the only proper check on the executive was by way of statutory enactment through the formal process of passing a bill.

"[W]hen the legislature wishes to act in an advisory capacity it may act by resolution. However, when it means to take action having a binding

effect on those outside the legislature it may do so only by following the enactment procedures.

\* \* \*

The legislature is bound to act in accordance with the constraints provided in the [state] constitution. The fact that it can delegate legislative power to others who are not bound by [the constitution] does not mean that it can delegate the same power to itself and, in the process, escape from the constraints under which it must operate. (footnote omitted).

To illustrate this point we may assume that the legislature has the power to establish an independent agency which would have the power to disapprove of agency regulations. Since the agency would be a part of the executive department, the [constitutional] constraints on legislative action would not govern its functions. Could the legislature instead convey to its own members the power to act as such an agency free from these constraints? The answer, we think, is clearly no for that would amount to dual office-holding, prohibited by [the section of the Alaska Constitution mirroring W. Va. Const. art. 5, § 1], and would infringe on the executive appointment power . . . . While the power to void agency regulations could be exercised by either the legislature, or by an agency, when the legislature exercises such power it must do so while acting as a legislature. It may not grant itself the power to act as an agency.[7] 606 P.2d at 773, 777-778.

---

[7] The *A.L.I.V.E.* case is especially important in light of the lack of treatment at the federal level, particularly in the United States Supreme Court. The high court has had at least one opportunity in recent years to address the issue, but declined to do so. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) the Court determined that the issue was not before it and declined to address it. Justice White, in a separate opinion, was the only member to address it, but he did not go into any extensive detail or discussion.

It is quite possible that the issue will soon be disposed of at the federal level. Recent developments involving congressional veto of certain Department of Education regulations has prompted a formal statement by Attorney General Benjamin Civiletti that such action is to be considered advisory only; that Congress may not constitutionally conduct coercive and formal review of such rules. Letter from

This is not to say that we believe all legislative review of rule-making to be void. Legislative rule-making review has purpose and merit and may be beneficially exercised and employed when contained within its proper and constitutional sphere. The respondent asserts that the purpose of creating the Legislative Rule-Making Review Committee and the present statutory scheme was to correct abuses of authority by administrative agencies and officials in exercising the rule-making power.[8] We do not question that

Benjamin Civiletti to Shirley M. Hufstedler, Secretary of Education (June 5, 1980). This has touched off intense debate, with parties on both sides of the issue seemingly wanting an authoritative ruling. *See* Klement, *Battle Looms Over Legislative Vetoes,* The National Law Journal, June 23, 1980, at 4, col. 2, *See also* Lofton, *Education Department Defies Congress,* printed in the Charleston Daily Mail, July 15, 1980, at 6A, col. 4.

[8] Many scholars point to the burgeoning bureaucracy in government today and tout the practicality of legislative rule-making review as a solution to the problem of insuring executive compliance with the legislative will in the face of increasing administrative regulation. *See generally* Bosivert, *A Legislative Tool for Supervision of Administrative Agencies: The Laying System,* 25 Fordham L. Rev. 638 (1957); Cooper and Cooper, *The Legislative Veto and the Constitution,* 30 Geo. Wash. L. Rev. 467 (1962); Melville, *Legislative Control Over Administrative Rule Making,* 32 U. Cinn. L. Rev. 33 (1963); Schwartz, *Legislative Control of Administrative Rules and Regulations; The American Experience,* 30 N.Y.U. L. Rev. 1031 (1955); and Stewart, *Constitutionality of the Legislative Veto,* 13 Harv. J. Legis. 593 (1976). *See also Investigating Committee,* 33 Col. L.J. 1 (1933). They cite with approval the British system of "laying" rules before Parliament for its approval and applaud the system as an efficient means of insuring faithful execution of the laws. While we commiserate with the Legislature in its attempts to diminish the negative effects of the current plague of "red tape" and "over-regulation", we think the respondent's argument misses the point.

Regardless of its inherent efficiency, informal coercive review of executive rule making is not permissible in the presence of a constitutional mandate that the powers of government be maintained in separate and distinct branches. In a parliamentary system, the executive branch is merely an arm of the legislative body. In a tripartite republic, the two branches are independent. The matter was summed up quite well by Chief Judge Crane in the case of *People v. Tremaine,* 281 N.Y. 1, 12; 21 N.E.2d 891, 896 (1939), where he stated in part:

We are not a parliamentary government where the Executive branch is also part of the Legislative .... We start with a

some procedure for review of agency rules and regulations may well be warranted, but we must require that it be done within the limits of the separation of powers doctrine and according to the system of checks and balances in our governmental framework. Alternatives to the present system may be found in the substantial literature relating to the problem.[9]

One of the most impressive pieces of literature on this subject which we have encountered is provided by H. Lee Watson in his article, *Congress Steps Out; A Look at Congressional Control of the Executive*, 63 Cal. L. Rev. 983 (1975) [hereinafter cited as *Watson*]. Specifically analyzing the use of what he calls "extra-legislative control devices" (means for direct legistaive review of executive action without the safeguards of the enactment process), Mr. Watson, using a test made up of four specific criteria,[10] concludes that such devices result in an unconstitutional

---

Constitution which is our province to interpret as it is written, and not as we think it might have been written.

The same point was stated less subtly by Justice Matthews in *State v. A.L.I.V.E. Voluntary, supra.*

[T]he question of whether the legislature might perform a task more efficiently if it did not have to follow [the constitution] is essentially irrelevant. Since [the constitution] applies, the question of whether efficiency takes primacy over other goals must be taken to have been answered by our constitutional framers. 606 P.2d at 778-779.

[9] *See, e.g.* Note, *Congressional Veto of Administrative Action*, 1976 Duke L.J. 285; Newman and Keaton, *Should Legislators Supervise Administrators*, 41 Cal. L. Rev. 565 (1953); Ginnane, *Control of Federal Administrators by Resolutions and Committees*, 66 Harv. L. Rev. 569 (1952); Watson, *Congress Steps Out; A Look at Congressional Control of the Executive*, 63 Cal. L. Rev. 983 (1975); *see also Neely, supra*, 79 W.Va. L. Rev. 513.

[10] The four criteria are as follows:

(1) whether the measure under examination forces legislators to choose between their constituency and the national interest;

(2) whether the measure encourages the exercise of self-interest independent of any pre-existing or co-existing local orientation of the power-wielding body;

(3) whether the statute tends toward legislative dominance of the government; and

(4) whether the statute fosters increase of overall federal power. [Not applicable to the discussion herein].

framework; "the creation of power to be wielded by the hand creating it." *Watson, supra,* pp. 990-991. Interestingly, Watson saves his most intense criticism for the sort of framework presented in this case.

Watson concludes that the legislative committee veto is the most clearly constitutionally invalid of the legislative control devices, rendered invalid per se by virtue of its impact on the process. By placing the final control over governmental actions in the hands of only a few individuals who are answerable only to local electorates, the committee veto avoids the concept of "constitutional averaging" forseen by the framers of the constitution as a means of balancing the dual role given legislators. While Watson views this consequence to our system of government as the most significant constitutional deficiency of the committee veto, he also considers it infirm in that it gives a small portion of the legislative membership a continuing role in governmental decision making once the formal lawmaking processes have been completed. The legislature vests the members of the committee with a post-legislative discretionary power, the exercise of which impermissibly fosters legislative dominance and expansion of power in several ways. First, by providing that the executive exercises discretion only at the pleasure of the reviewing committee, the legislature usurps the traditional role of the executive to fill in the interstices left by flexible statutory standards by exercising legislatively delegated discretionary power. In effect the executive exercise of discretion is replaced by committee exercise of discretion, increasing the role of the legislature at the expense of the executive.

Secondly, as the power of the executive to execute the laws is determined by the amount of discretion given it by the legislature, the more broadly a statute is drawn, the more power will be abdicated to the executive. Ordinarily the legislature attempts to prepare specific and narrowly drawn legislation in order to limit or to control the exercise of discretion by the executive. Where, however, the legislature retains jurisdiction over the discretionary power it vests in the executive, it no longer has the incentive to limit that power. The element of balance between the two branches no longer exists. Finally, Watson

decries the creation of discretionary power to be wielded by the same hand. "Where the effectiveness of discretionary power is maximized by delegating the authority to a group of manageable size, a committee or even an individual, the danger of self-interest is also maximized." *Watson, supra,* p. 1056. These guidelines should prove useful in helping to avoid the infirmities which render void the statutory rule-making review scheme embodied in our Administrative Procedures Act.

Upon the record and in consideration of the briefs and arguments of counsel, we conclude and hold that W.Va. Code §§ 29A-3-11 and 12, empowering the Legislative Rule-Making Review Committee to veto rules and regulations otherwise validly promulgated by administrative agencies pursuant to a legislative delegation of rule-making power, violate the separation of powers doctrine embodied in article V, section one of our state constitution and are, therefore, void. We further conclude that the remaining provisions of article 3 of chapter 29A of the West Virginia Code are not so interrelated to and dependent upon the unconstitutional portion of the statute as to render the entire article void. *See State ex rel. Cogar v. Kidd,* 160 W. Va. 371, 234 S.E.2d 899 (1977); *Robertson v. Hatcher,* 148 W. Va. 239, 135 S.E.2d 675 (1964). Consequently we are of the opinion that article 3 of chapter 29A, as enacted by the Legislature in 1976, may remain in force and effect except insofar as it provides for coercive review and veto of administrative rules and regulations by the Legislative Rule-Making Review Committee.

For the reasons stated herein, the petitioner's prayer is granted and a writ of mandamus will promptly issue directing and requiring the respondent, A. James Manchin, Secretary of State of West Virginia, to receive, file, and place in force and effect the validly promulgated rules and regulations governing the safety of those employed in and around surface mines in West Virginia of the Department of Mines, as transmitted to him, on or about April 23, 1979, by Walter L. Miller, Director of the Department of Mines, all in accordance with and as provided by article 3 of chapter 29A of the West Virginia Code.

*Writ awarded.*