**FILED**
**November 24, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 19-1132 – *State of West Virginia ex rel. James Conley Justice, II, Governor of the State of West Virginia v. The Honorable Charles E. King, Jr., Judge of the Circuit Court of Kanawha County, West Virginia, and G. Isaac Sponaugle, III*

**Hutchison, Justice, dissenting:**

The majority opinion is a well-written exposition on the 1863 and 1872 Constitutional debates. The founders of West Virginia believed every governor "must remove to the seat of government" and "live . . . at the capital so we may at least find him[.]"

But the statements made in those debates must be taken with a grain of salt. In the same passages of the debates quoted by the majority opinion, the founders debated whether the governor should be furnished with "a horse and buggy[.]"[1] I doubt the founders conceived of the notion that a governor would someday be able to travel to all four corners of the state in a single day by car or plane. Except for the telegraph, the founders never suspected the governor would be able to speak at length with faraway "strangers . . . parties, individuals, companies, associations or their officers" in the four corners of the globe and give them "information as to the geography or resources" of West Virginia using a cellphone or video conference technology.

---

[1] Deplorably, the founders also used the derogatory "n"-word during the debates about the governor's residence and salary. *See generally* 3 Charles H. Ambler, et al., *Debates and Proceedings of the First Constitutional Convention of West Virginia (1861-1863)*, 323-329 (1939).

1

Still, these are academic considerations. We can dicker all day about what the founders really meant in 1862 when discussing the governor's proper abode, or how the century-and-a-half old Constitution should be applied in the modern day. The majority opinion does a great job concluding that the word "reside" means "reside," and then dumps the case back on the circuit judge to figure out what "reside" *really* means on the facts of this case.

I dissent because, for all the sound and fury and righteous indignation embodied within the majority opinion, I cannot foresee a satisfactory end result forthcoming from the circuit court. The question I had running through my mind when I read the opinion is simple: How does this end?

The Constitution of this State declares that the "legislative, executive and judicial departments shall be separate and distinct[.]" W. Va. Const. Art. V., § 1. With regard to this provision, this Court has stated:

> The separation of these powers; the independence of one from the other; the requirement that one department shall not exercise or encroach upon the powers of the other two, is fundamental in our system of government, State and Federal. Each acts, and is intended to act, as a check upon the others, and thus a balanced system is maintained. No theory of government has been more loudly acclaimed.

*State v. Huber*, 129 W. Va. 198, 209, 40 S.E.2d 11, 18 (1946). "Article V, section 1 of the Constitution . . . is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed." Syl. pt. 1, in part, *State ex rel. Barker v. Manchin*, 167 W. Va. 155, 279 S.E.2d 622 (1981).

The separation of powers clause gives each branch of government the discretion to decide *how* to fulfill the obligations imposed by the Constitution:

> The separation of powers doctrine implies that each branch of government has inherent power to "keep its own house in order," absent a specific grant of power to another branch, such as the power to impeach. . . . This theory recognizes that each branch of government must have sufficient power to carry out its assigned tasks and that these constitutionally assigned tasks will be performed properly within the governmental branch itself.

*State v. Clark*, 232 W. Va. 480, 498, 752 S.E.2d 907, 925 (2013).

Furthermore, no constitution is a living document. It is the people and their chosen representatives who breathe life into a constitution's words and give them effect. The separation of powers clause only works, and only protects our tripartite system of checks and balances, if every officer of every branch deliberately respects the right of the other branches to function freely:

> The Separation of Powers Clause is not self-executing. Standing alone the doctrine has no force or effect. The Separation of Powers Clause is given life by each branch of government working exclusively within its constitutional domain and not encroaching upon the legitimate powers of any other branch of government. This is the essence and longevity of the doctrine.

*State ex rel. Affiliated Constr. Trades Found. v. Vieweg*, 205 W.Va. 687, 702, 520 S.E.2d 854, 869 (1999) (Davis, J., concurring). When we do not respect the guardrails written in our foundational document, we drift closer and closer to tyranny or anarchy.

3

Now, I say this knowing full well that Mr. Sponaugle's lawsuit against the governor is well-intentioned and is not some scheme aimed toward despotism. My problem with Mr. Sponaugle's lawsuit is that I cannot see how it ends or if it ends.

The majority opinion brushes off the Governor's argument that any remedy imposed by a circuit court would be impractical and unmanageable. In support of their opinion, the majority quotes an article from 1936 that says that simply because crafting a remedy may be difficult is no reason to not try and find a remedy. That *sounds* good, but this is not an academic question being debated in a classroom. I cannot foresee either a practical or constitutional manner in which the judge can bring this case to a conclusion. This is the heart of my disagreement with the majority opinion.

Judges have broad constitutional authority to order executive officials to carry out their mandatory duties. Of this, I am certain. But even the majority opinion concedes that the Governor has *discretion* to decide how to carry out a mandatory duty. Under the separation of powers doctrine, members of the executive branch have the power to keep their own house in order. So, in the end, if the circuit court says the Governor must reside in Charleston, what force and effect would that order have where the Governor gets to decide how to carry his residency requirement into effect? Just how tangled up are the courts going to get monitoring the Governor?

The possibilities for the circuit court are both endless and absurd. What if the governor announces that he will reside in the Governor's Mansion, the "official

residence" in Charleston?  Then he keeps two suits and two pairs of underwear there and loudly declares his intent to return to the Mansion because "it is my residence."  Is that sufficient?  Can the circuit judge say, no, the Governor needs at least four suits and four pairs of underwear stored at the Mansion to show he is residing there at least four days a week?  Can the judge appoint a monitor to inspect the residence to see if the sheets are mussed the required number of days of the week?  Can the judge require the Governor to wear an ankle bracelet so his whereabouts are known at all times, and we can know for sure he has a "physical presence" that is "primarily" in Charleston?

The majority opinion's definition of "reside" includes a "physical presence" at the seat of government for the duration of the Governor's term of office.   Does that mean the Governor must be physically present in Charleston during the daytime?  If he is here during the daytime work hours Monday through Friday, he can conduct the State's business but I'm not sure that meets the definition of "residing."  I drive to work every day from Raleigh County, my daylight hours are spent primarily in Charleston, and I have an intent to return here every day until the end of my term.  But I would never say I "reside" in Charleston.

What about the nighttime?  If the Governor is in Charleston during the night, at his place of abode, I think he's pretty clearly "living" and "domiciling" and "residing" and "nesting" or whatever it is the majority opinion thinks the Governor is supposed to do.  But at night, he's probably sleeping and not conducting the State's business.  If the

5

Governor sleeps here at his residence, how are we to say he is actually accomplishing the duties set forth for the executive branch in our Constitution?

The true point that Mr. Sponaugle is trying to make in his case is one of effective and efficient government. Mr. Sponaugle contends that the Governor is not meeting his constitutional duties as efficiently as he could be; the Governor is not as effective at his job as he would be if he just spent some more time eating breakfast in Charleston. Being "for efficient government" is a very persuasive-sounding statement that is hard to disagree with, just like when a politician says he is "against crime" and "for lower taxes." The point he makes is practical and impossible to argue against. Mr. Sponaugle knows this as an elected member of the Legislature.

However, we aren't in a political arena; we are in a courtroom. And the point Mr. Sponaugle is trying to score is purely a political one. His challenge is not to the Governor's residency; it is to the decisions the Governor has made about how he runs his office. Mr. Sponaugle's argument conflates residency with efficient executive management. The argument is that, if the Governor just slept in Charleston more, then the Governor would probably make himself more available to one-on-one visits from members of the Legislature. Mr. Sponaugle clearly concludes that, if a judge would simply tell the Governor to spend more time in Charleston, then he will be a better, more effective leader with better relations to members of the Legislature.

Unlike the majority opinion, I sense that Mr. Sponaugle's "effective government" argument in this case is preempted by the "political question" doctrine. This case is a political spat for the legislative and executive departments to resolve. It should not involve the judiciary. Chief Justice John Marshall recognized early in the existence of our constitutional system of government that courts cannot "enquire how the executive, or executive officers, perform duties in which they have [] discretion." *Marbury v. Madison*, 5 U.S. 137, 170 (1803). The lesson he made is that "[q]uestions, in their nature political . . . can never be made in this court." *Id*. West Virginia abides by this rule. As this Court has said, "Questions involving perceived conflict between the legislative and executive branches are, by and large, political questions, which do not present issues with which this Court can, or should, concern itself." *State ex rel. League of Women Voters of W. Virginia v. Tomblin*, 209 W. Va. 565, 574, 550 S.E.2d 355, 364 (2001).

Stated simply, the judiciary is powerless to second-guess the quality of decisions by the executive or legislative departments. The efficiency of the Governor's management style, the effectiveness of the efforts of the Governor toward running the affairs of the State, are not justiciable questions. No court can effectively answer the political question propounded by Mr. Sponaugle. If a court requires the Governor to live in the executive mansion four nights a week, that really will not solve Mr. Sponaugle's true complaint about the way the Governor is managing his office. A court cannot issue a writ of mandamus to say to the Governor must do a better job or exercise discretion in a different way.

7

The real question then is, to what extent does the Constitution empower a circuit judge to meddle in the day-to-day affairs of an officer of another branch? Even the majority opinion concedes "that, if mandamus were to regulate the comings and goings of the Governor, such action would violate separation of powers principles." ___ W.Va. at ___ S.E.2d. at ___ (Slip Op. at 17). If the judge in this case commands the Governor to "reside in Charleston," what does that really mean in the end? In one sentence, the majority opinion concedes that is the limit of the judge's authority. If, as the majority opinion seems to require, the Governor announces that he will make Charleston his principal place of physical presence and his "home base," then the courts can do little more. To go any further and attempt to delineate how the Governor must act so as to achieve efficient or effective governance is clearly a political question that the courts should not be asked to resolve.

The Constitution has two clear penalties if an executive officer fails to live in Charleston: the Legislature can impeach the officer, or the voters can remove him or her from office. The separation of powers doctrine is not merely a suggestion, it is a principal every constitutional officer must strive to enforce. I believe too much mischief abounds when the judicial branch is asked to monitor the day-to-day actions of a state officer and approve how the officer carries out the discretionary obligations entrusted to him by the people. How the executive or legislative branches choose to operate are discretionary political questions beyond the purview of a judge. I appreciate why Mr. Sponaugle *started* this lawsuit over the Governor's residency; I dissent because I cannot see how, or if ever, this ends.