520 S.E.2d 854

STATE of West Virginia ex rel. the AF-
FILIATED CONSTRUCTION TRADES
FOUNDATION, a Division of the West
Virginia Building and Construction
Trades Council, AFL–CIO, and All
Those Similarly Situated, Petitioner,

v.

William F. VIEWEG, Commissioner, Bu-
reau of Employment Programs, and
Compensation Programs Performance
Council, Respondents.

No. 26364.

Supreme Court of Appeals of
West Virginia.

Submitted June 29, 1999.

Decided July 14, 1999.

Stuart Calwell, Esq., John H. Skaggs, Esq., The Law Offices of Stuart Calwell, PLLC, Charleston, West Virginia, Attorneys for the Petitioner.

Ancil G. Ramey, Esq., Thomas M. Woodward, Esq., L. Eugene Dickinson, Esq., WVBEP, Legal Services Bureau, Charleston, West Virginia, Attorneys for Vieweg.

Franklin D. Cleckley, Esq., Morgantown, West Virginia, Attorney for Compensation Programs Performance Council.

John L. McClaugherty, Esq., A.L. Emch, Esq., Mychal S. Schulz, Esq., Jackson & Kelly, Charleston, West Virginia, Attorneys for WV Chamber of Commerce.

Thomas P. Maroney, Esq., Thomas P. Maroney, L.C., Charleston, West Virginia, Attorney for AFL–CIO WV Labor Federation.

Bradley J. Pyles, Esq., Crandall, Pyles, Haviland & Turner, Logan, West Virginia, Attorney for United Mine Workers of America.

Karen Price, President, West Virginia Manufacturers Association, Charleston, West Virginia.

Amicus Briefs: Barbara H. Allen, Esq., William S. Steele, Esq., Attorney General Darrell V. McGraw, Jr., Anthony Majestro, Esq., William D. Turner, Esq., WV Trial Lawyers Association; John L. McClaugherty, Esq., A.L. Emch, Esq., Mychal S. Schulz, Esq., WV Coal Association & WV Mining &

Reclamation Association; David Grubb, Esq., John Barret, Esq., WV Citizen Action Group, Inc.; Henry C. Bowen, Esq., WV Business & Industrial Council.

Amici Brief: John Poffenbarger, Esq., West Virginia Department of Administration; Perry Pauley, Esq., West Virginia Department of Education and the Arts; Susan Settle, Esq., West Virginia Department of Health and Human Resources; Phyllis Carter, Esq., West Virginia Department of Military Affairs and Public Safety; Dale W. Steager, Esq., West Virginia Department of Tax and Revenue; Anthony G. Halkias, Esq., West Virginia Department of Transportation; William E. Adams, Jr., Esq., West Virginia Bureau of Environment.

PER CURIAM:

This case is before the Court upon a petition for writ of prohibition filed by the petitioner, The Affiliated Construction Trades Foundation, a division of the West Virginia Building and Construction Trades Council, AFL–CIO, and all those similarly situated, against the respondents, William F. Vieweg, Commissioner, Bureau of Employment Programs, and the Compensation Programs Performance Council. The petitioner seeks a writ prohibiting Commissioner Vieweg from dismissing civil actions instituted by the Workers' Compensation Division against certain corporate entities under theories of imputed liability for delinquent workers' compensation premiums, penalties and interest; prohibiting the Commissioner from having any further involvement in these actions; and directing the Commissioner and the Compensation Programs Performance Council to promulgate rules and regulations governing the conduct of litigation commenced by the Commissioner. We issued a rule to show cause and now deny the petitioner the relief which it seeks.

I.

FACTS

In the original proceeding before us, this Court has the pleadings, affidavits and exhibits of the parties as well as several briefs of

amicus curiae.[1] From these we glean the following facts.

In 1996 and 1998, the Workers' Compensation Division ["the Division"] instituted civil actions against several coal companies asserting theories of imputed liability for workers' compensation premiums that had not been paid by entities with whom those companies had contracted.[2] Because of concerns about the progress of these civil actions, the Commissioner recently sought advice from the Compensation Programs Performance Council ("the council") concerning the continued prosecution of these actions.[3]

On March 12, 1999, the council adopted Resolution 30 recommending that the Commissioner "take such action as is deemed necessary to terminate, withdraw or otherwise dismiss any party or entity named as a defendant whose liability, if any, for payment of premium is not direct under the workers compensation laws ... and whose own account with the Division is deemed to be in good standing."[4] The council emphasized that the division "should continue to pursue collection from those parties or entities, including responsible officers, whose accounts remain in default and which parties, entities or officers have direct responsibility for and means of payment of premium, interest and/or penalty under the workers compensation statutes ... and applicable case law."[5] The council's recommendation was unanimous. The council listed several reasons in support of the recommendation. These included:

> WHEREAS, the Division has in fact initiated civil actions against certain parties, founded upon certain complex theories of law which are without precedence in the field of workers compensation law in West Virginia, and perhaps in other states, claiming liability of such parties for the defaulted premium obligations of other employers and further claiming such parties

1. In addition to pleadings of the parties, we also received solicited responses from the West Virginia Chamber of Commerce and the West Virginia Manufacturers Association on behalf of the respondents, and the AFL–CIO West Virginia Labor Federation and the United Mine Workers of America on behalf of the petitioner. Also, we received amicus curiae briefs from Attorney General Darrell V. McGraw, Jr., the West Virginia Trial Lawyers Association and the West Virginia Citizen Action Group on behalf of the petitioner, and the West Virginia Coal Association & West Virginia Mining & Reclamation Association and the West Virginia Business & Industrial Council on behalf of the respondents. Also, the West Virginia Department of Administration, the West Virginia Department of Education and the Arts, the West Virginia Department of Health and Human Resources, the West Virginia Department of Military Affairs and Public Safety, the West Virginia Department of Tax and Revenue, the West Virginia Department of Transportation and the West Virginia Bureau of Environment filed an amici brief with this Court urging us to refuse the extraordinary relief requested. The brief also asks that we address the separation of powers issue raised herein. Because this issue is not necessary to the disposition of this case, we decline to review it. We appreciate the participation of the above-listed parties in this case. Their arguments were considered in our decision.

2. In the pleadings filed herein, the nature of these contracts is characterized as ones in which the party which owns the economic interest in the coal pays another company to actually mine the coal or the coal owners subleased the coal properties to third parties. The specific terms of these agreements vary greatly within the coal industry. The third parties who mined the coal are the defendants in the civil actions which are at issue.

3. The Compensation Programs Performance Council was created pursuant to W.Va.Code § 21A–3–1 et seq. Its purpose is to "ensure the effective, efficient and financially stable operation of the unemployment compensation system and the workers' compensation system." W.Va. Code § 21A–3–1 (1993). The council is comprised of nine members, four of whom represent employees, four of whom represent employers, and the Commissioner who serves as chair of the council.

4. According to the Commissioner, the claims to be dismissed were against coal owners and lessees who were in good standing with the Division on their own accounts but whose subcontractors failed to meet their workers' compensation premium obligations.

5. According to W.Va.Code § 23–2–4(a) (1995) in part:

> The commissioner, in conjunction with the compensation programs performance council, is authorized to establish by rule a system for determining the classification and distribution into classes of employers subject to this chapter, [and] a system for determining rates of premium taxes applicable to employers subject to this chapter[.]

to be related or affiliated in some manner to the defaulting employers; and

WHEREAS, it appears that the amount of defaulted premium due and owing approximates $95 million and the interest and penalties thereon also approximate $95 million and further accumulating at the rate of $3 million per month; and

WHEREAS, outside litigation expenses to date have totaled $3 million; and

WHEREAS, the Division may expect to incur ongoing outside litigation expenses of $30,000 per month in addition to the ongoing but undetermined administrative and managerial time and other resources committed in support of the litigation; and

WHEREAS, the representation agreement with outside counsel imposes on the Division certain contractual obligations for purchase of a data system at fair market value which may total $700,000; and

WHEREAS, the representation agreement provides for the outside counsel to be compensated on a contingent fee basis in accord with Ch. 21A–2–6(17)(B), which basis has been an obstacle to settlement of certain of the pending actions; and

WHEREAS, due to the nature of the complex theories of law upon which the claims against parties deemed only to be liable on a vicarious basis are founded,[6] any estimate of recovery would be wholly speculative; however, it is anticipated with a high degree of certainty that a favorable trial decision to any of the parties will likely result in appeal by the party adversely affected; and

WHEREAS, claims may still be pursued against those defaulting employers and their responsible officers deemed directly liable for payment of premium, penalty and interest under traditional collection theories recognized under the workers compensation law; and

WHEREAS, current underground coal employers participating in the workers compensation system are paying through the premium rating mechanism all claims arising from the defaulted employers with direct liability for premium, while all employers in good standing in the workers compensation system are bearing the expenses associated with the litigation; and

WHEREAS, over a long period of time preceding the filing of this litigation, the Division failed to adequately enforce premium payments from those directly responsible therefor under the workers compensation law and due to enhanced data systems, increased staffing, and strengthened statutes, it is unlikely that the environment which permitted such failures would be replicated; and

WHEREAS, it being the conclusion of the Council that further expenditure of Division funds in support of litigation founded upon the complex theories is not justified by the expectation of recovery or the need for precedent to discourage other parties from utilizing subcontractors as a means for workers compensation tax avoidance[.] (Footnote added).

On May 20, 1999, the Commissioner publicly announced his decision to dismiss cases filed against those parties which were claimed to be liable for payment of premium taxes due and owing from their contractors and to continue to pursue recovery against workers' compensation subscribers and their responsible officers under traditional legal theories.[7] Thereafter, the petitioner filed the writ of prohibition which is the subject of this case.

6. The petitioner and the respondents dispute the viability of the theories upon which the civil actions below are based. We need not address this issue in order to decide the case before us.

7. The Commissioner notes in his response that his decision to dismiss the lawsuits was supported by the Governor, the President of the State Senate, the Speaker of the House of Delegates, the President of the West Virginia AFL–CIO; and the President of the Business and Industry Council. He also states that on the same day, the council approved a new premium rate-making plan that will assure that West Virginia's underground coal mining industry bears the burden of the workers' compensation fund associated with the past failure of underground coal mining subscribers to pay their workers' compensation premiums.

692

## II.

### DISCUSSION

 The petitioners herein seek a writ of prohibition. According to W.Va.Code § 53–1–1 (1923), "[t]he writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." This Court has said that " ' "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W.Va.Code,* 53–1–1." Syl. pt. 2, *State ex rel. Peacher v. Sencindiver,* 160 W.Va. 314, 233 S.E.2d 425 (1977).' Syllabus point 3, *State ex rel. McDowell County Sheriff's Dept. v. Stephens,* 192 W.Va. 341, 452 S.E.2d 432 (1994)." Syllabus Point 1, *State ex rel. Charleston Area Medical Center, Inc. v. Kaufman,* 197 W.Va. 282, 475 S.E.2d 374 (1996). *See also* Syllabus Point 1, *Crawford v. Taylor,* 138 W.Va. 207, 75 S.E.2d 370 (1953). We have stated that "[p]rohibition lies only in case of the unlawful exercise of judicial functions. Acts of a mere ministerial, administrative, or executive character do not fall within its province." Syllabus Point 4, *Fleming v. Kanawha County Com'rs,* 31 W.Va. 608, 8 S.E. 267 (1888). *See also* Syllabus Point 2, *State ex rel. City of Huntington v. Lombardo,* 149 W.Va. 671, 143 S.E.2d 535 (1965). This Court has determined that prohibition lies not only to judicial tribunals, but to inferior ministerial tribunals possessing incidentally judicial powers and known as quasi-judicial tribunals. *See Wiseman v. Calvert,* 134 W.Va. 303, 59 S.E.2d 445 (1950); *Brazie v. Fayette County Com'rs,* 25 W.Va. 213 (1884); *State ex rel. City of Huntington v. Lombardo, supra.* This includes administrative tribunals having quasi-judicial power when acting in a quasi-judicial capacity. *See United States Steel Corp. v. Stokes,* 138 W.Va. 506, 76 S.E.2d 474 (1953). Prohibition will not lie, however, to prevent administrative action. *Wiseman, supra* (prohibition does not lie against county courts in exercising power not judicial or quasi judicial); *State ex rel. Noce v. Blankenship,* 93 W.Va.

273, 116 S.E. 524 (1923) (prohibition does not lie against county sheriffs); *State ex rel. City of Huntington, supra; Hartigan v. Board of Regents,* 49 W.Va. 14, 38 S.E. 698 (1901) (prohibition does not lie against the Board of Regents in its removal of a professor); *United States Steel Corp. supra.*

. In the instant case, a writ of prohibition is sought against the workers' compensation Commissioner who is an administrative official within the executive branch of our state government. W.Va.Code § 23–1–1(a) (1999) provides that the Commissioner "has the sole responsibility for the administration of [the workers' compensation system]. . . . [and] shall exercise all the powers and duties described in this chapter and in . . . [§ 21A–2–1, et seq.] . . . of this code." W.Va.Code § 21A–2–6 (1996) provides that the Commissioner has the power to, *inter alia,* supervise fiscal affairs and responsibilities of the Bureau of Employment Programs; invoke any legal or special remedy for the enforcement of orders; and exercise any other power necessary to the administration of bureau business. It is clear, and the petitioner does not dispute, that in dismissing the actions at issue the Commissioner was not performing a judicial or quasi-judicial function. Rather, the dismissal of the lawsuits constitutes a purely administrative function. As we noted above, the writ of prohibition never issues against administrative officials performing purely administrative acts. Accordingly, we hold that a remedy by prohibition does not lie in this proceeding and, for that reason, the writ of prohibition will not be issued.

We note that the petitioner sought only a writ of prohibition in its petition filed with this Court. During oral argument, however, it attempted to request relief by a writ of mandamus. This Court has, on occasion, treated a request for relief in prohibition as a petition for a writ of mandamus, or vice versa, if the facts so warranted. *See State ex rel. Ranger Fuel Corp. v. Lilly,* 165 W.Va. 98, 267 S.E.2d 435 (1980); *Carr v. Lambert,* 179 W.Va. 277, 367 S.E.2d 225 (1988). Accordingly, even though the petitioner did not originally plead in the alternative, we will now proceed to consider the petition as a request for mandamus relief.

The petitioner essentially argues that the Commissioner has violated his fiduciary obligation to the workers' compensation fund set forth in W.Va.Code § 23–2–4(a)(2) (1995).[8] According to the petitioner, the fund currently has "an actuarial determined, discounted deficit of in excess of $1.9 billion." Because the lawsuits at issue were originally instituted to collect approximately two hundred million dollars owed to the fund, the dismissal of the lawsuits will prove injurious to the solvency of the entire workers' compensation system. Therefore, concludes the petitioner, this Court should compel the Commissioner to fulfill his fiduciary obligation to the fund by mandating that he prosecute the lawsuits for unpaid premiums.

It is axiomatic in the law that,

A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). We have characterized the purpose of the writ as the enforcement of an established right and the enforcement of a corresponding imperative duty created or imposed by law. *See State ex rel. Bronaugh v. City of Parkersburg*, 148 W.Va. 568, 136 S.E.2d 783 (1964). "Mandamus is a proper remedy to require the performance of a nondiscretionary duty by various governmental agencies or bodies." Syllabus Point 1, *State ex rel. Allstate Insurance Co. v. Union Public Service District*, 151 W.Va. 207, 151 S.E.2d 102 (1966); *See State ex rel. Board of Education v. Miller*, 153 W.Va. 414, 168 S.E.2d 820 (1969); *Delardas v. County Court of Monongalia County*, 155 W.Va. 776, 186 S.E.2d 847 (1972); *State ex rel Anderson v. Bd. of Ed. of Mingo Cty.*, 160 W.Va. 208, 233 S.E.2d 703 (1977). Finally, "[m]andamus lies to control

the action of an administrative officer in the exercise of his discretion when such action is arbitrary or capricious." Syllabus, *Beverly Grill, Inc. v. Crow*, 133 W.Va. 214, 57 S.E.2d 244 (1949); *See also* Syllabus Point 1, *State ex rel. Payne v. Board of Education of Jefferson County*, 135 W.Va. 349, 63 S.E.2d 579 (1951)("Mandamus does not lie to control a board of education in the exercise of its discretion, in the absence of caprice, passion, partiality, fraud, arbitrary conduct, some ulterior motive, or misapprehension of law upon the part of such board."); *State ex rel. McLendon v. Morton*, 162 W.Va. 431, 249 S.E.2d 919 (1978); *State ex rel. Withers v. Board of Educ. of Mason County*, 153 W.Va. 867, 172 S.E.2d 796 (1970); *State ex rel. Board of Education v. Miller, supra; State ex rel. Waller Chems. v. McNutt*, 152 W.Va. 186, 160 S.E.2d 170 (1968). We will now apply these principles to the facts before us.

This Court agrees with the petitioner that the Commissioner has a fiduciary obligation to maintain the workers' compensation fund. We have not hesitated on prior occasions to recognize the fiduciary obligation of officers who oversee state funds set up for the benefit of designated classes of individuals. Also, we have exercised this Court's mandamus power to compel executive and legislative officials to maintain the fiscal soundness of state funds in their capacities as fiduciaries. For example, in *Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1988), we compelled the Governor to include in his appropriation plan for fiscal year 1990–91 the actuarially determined amounts of contributions earned by state employees to the Public Employees Retirement System (PERS) Fund. We further compelled the Senate President and Speaker of the House to introduce in their respective houses proposed budget bills to meet the PERS requirements. More recently, in *State ex rel. Deputy Sheriffs' Ass'n v. Sims*, 204 W.Va. 442, 513 S.E.2d 669 (1998), we held in Syllabus Point 2:

8. According to W.Va.Code § 23–2–4(a)(2) (1995):
 The rule [for determining rates of premium taxes applicable to employers] shall be consistent with the duty of the commissioner and the compensation programs performance council to fix and maintain the lowest possible rates of

premium taxes consistent with the maintenance of a solvent workers' compensation fund and the reduction of any deficit that may exist in such fund and in keeping with their fiduciary obligations to the fund[.]

> The fiduciary duty of the Consolidated Public Retirement Board ... with respect to the public employee pension funds and assets entrusted to the Board, includes the affirmative duty to monitor and evaluate the effect of legislative actions that may affect such funds and assets, and to take all necessary actions including initiating court proceedings if necessary to protect the fiscal and actuarial solvency of such funds and assets.

In Syllabus Point 3, however, we stated:

> The speculative possibility that the transfer of funds and assets that is required ... from the [PERS] trust fund to the deputy sheriffs' retirement fund ... may impair the fiscal solvency of the PERS trust fund does not bar the transfer of assets where legal mechanisms exist that can detect and correct any impaired solvency in a timely fashion.

Likewise, in the instant case, the possibility that the dismissal of the civil actions at issue will impair the workers' compensation fund and render the fund unable to fulfill its purpose is nothing more than speculation.

The petitioner has not shown that the Commissioner violated his fiduciary duty to maintain the workers' compensation fund. The Commissioner has represented to this Court that a program was implemented in 1997 to reduce the workers' compensation deficit. The Commissioner has also stated in an affidavit that no eligible injured worker or dependent of a fatally injured worker has failed to receive any benefit payable under the worker's compensation system due to any employer's default of its premium obligations. In light of this, as well as the complete lack of evidence to the contrary, we find that the Commissioner has not breached his fiduciary duty to the workers' compensation fund.[9] Also, while this Court can mandate that the Commissioner fulfill his fiduciary duty, it is powerless to mandate the manner in which this duty is to be performed. "Mandamus is a proper remedy to compel tribunals and officers exercising discretionary and judicial powers to act, when they refuse so to do, in violation of their duty, but it is never employed to prescribe in what manner they shall act, or to correct errors they have made." Syllabus Point 1, *State ex rel. Buxton v. O'Brien and the County Court of Mason County*, 97 W.Va. 343, 125 S.E. 154 (1924). The one area, above all, where a court should exercise caution is when it is deciding its own power. The power of this Court simply does not extend to sitting in judgment on every lawful discretionary act performed by an executive officer pursuant to the execution of his or her responsibilities, regardless of how politically unpopular that act may be. Accordingly, we find no merit to the petitioners' argument concerning the Commissioner's fiduciary obligation.

The petitioner's more specific complaint is that the Commissioner has dismissed certain civil actions. However, we

9. In an affidavit filed with this Court, the Commissioner states:

> That, on May 20, 1997 to be effective July 1, 1997, in accord with its statutory powers and duties and upon recommendation of the Commissioner, the Council unanimously approved a premium rate-making plan and base premium rates designed, among other things, to eliminate a staggering deficit and return the workers' compensation system to a sound financial basis, including elimination of across-class subsidies on a prospective basis for underground coal mining and certain other classes of business and industry;
>
> That the rate-making plan, adopted by the Council, assures that the underground coal mining industry in West Virginia, as a class, bears the entire burden imposed on the workers' compensation system by the failure of coal subcontractors to meet their premium obligations, as well as the burden caused by the abject failure of past administrators of the workers' compensation system to enforce payment of premium by such defaulting subcontractors under the workers' compensation law;
>
> That the rate-making plan, adopted by the Council, assures that only those employers in the underground coal class bear the cost of claims of employees of the defaulted subcontractors;
>
> That the rate-making plan, adopted by the Council, is accomplishing its objectives, having eliminated any subsidy from other business and industry classes to the benefit of the underground coal class and contributing more than $200 million to reduce the $2.2 billion workers' compensation deficit inherited by the current administration. The deficit reduction program adopted by the Council in 1997 is at least five (5) years ahead of the schedule projected by the prior administration[.]

have not been informed nor are we aware of any statute or regulation that requires the Commissioner to institute and prosecute the kinds of actions involved in this case. The Commissioner's power to commence and discontinue litigation is clearly discretionary. Notably, the great cost of the litigation to date necessitates weighing the potential value of the civil actions against the expense of their continued prosecution. This involves a judgment call that by law must be made by the Commissioner. While this Court may or may not agree with the Commissioner's course of action, it simply is not our decision to make. The discretionary nature of the decision at issue distinguishes this case from *Dadisman* where the duties of the executive and legislative officials mandated by this Court were specifically provided for by constitutional provision and statute. Also, as noted above, the petitioner fails to prove that the dismissal of the actions further impairs the solvency of the fund. Accordingly, we find that the Commissioner has not failed to perform a mandatory, nondiscretionary duty.

Further, we have before us the performance council's and the Commissioner's detailed rationale for dismissing the actions.

After considering this rationale, we are unable to find that the Commissioner acted with caprice, passion, partiality, fraud, arbitrarily, with some ulterior motive or misapprehension of the law.

In addition, we note the petitioner raises the specter of conflict of interest in the dismissal of the civil actions. This charge, however, is wholly unsubstantiated and amounts to nothing more than speculation.[10] Accordingly, we also reject the petitioner's plea to remove the Commissioner from any further involvement in the civil actions.[11]

■ Finally, the petitioner also requests that we direct the Commissioner and performance council to promulgate rules governing the conduct of litigation commenced by the Commissioner. Again, we are aware of no legal requirement for the promulgation of rules and regulations governing the lawful exercise of an executive official's discretionary judgment. Therefore, we decline to direct the promulgation of such rules.

In summary, we find that the dismissal of lawsuits such as those involved in this case lies within the discretion of the Commissioner. Further, we find that the Commissioner's

10. In an affidavit filed with this Court, the Commissioner states the following:

That from April, 1976 to February, 1986 the Respondent was employed by the Coal Division of Occidental Petroleum Corporation through initially its subsidiary Island Creek Coal Company and subsequently Occidental's Island Creek Coal Corporation subsidiary (hereinafter collectively "Island Creek");

That among Respondent's duties and responsibilities with Island Creek were management of all insured and self-insured workers' compensation programs for Island Creek employees in the several states where Island Creek operated, including West Virginia;

That at all times during Respondent's tenure of employment with Island Creek and thereafter, Island Creek's account with the Division was fully paid and deemed by the Division to be in good standing;

That Respondent's employment with Island Creek did not include any duties or responsibilities relating to contractors, subcontractors or contract mining operations in West Virginia, or relating to employees of such contractors or subcontractors, if there were any such during Respondent's employment with Island Creek;

That Respondent terminated employment with Island Creek in January, 1986;

That Respondent had vested rights in a pension program with Island Creek that was fully funded at the time of such termination of employment by Island Creek's purchase of an annuity through an unrelated insurance company, the receipt of any payments thereunder being wholly independent of any profit or loss incurred by Island Creek subsequent to such termination;

That at the time of Respondent's appointment to the position of Commissioner and continuing to this date, he neither had nor has any known financial or other interest in Occidental Petroleum Corporation or Island Creek, including any interest which could be deemed to conflict with his duties and responsibilities as Commissioner[.]

11. The petitioner also argues that W.Va.Code § 23–2–5(f)(1) (1999) prohibits the Commissioner from waiving premium and interest owed to the fund. However, this statute concerns only subscribers to the fund who have defaulted in their payment of premiums. The civil actions in the instant case seek to collect payments from parties who cannot be said to have defaulted on their workers' compensation payments. Therefore, we find that this statute is not applicable.

dismissal of the civil actions was not arbitrary or capricious. Accordingly, because there is no clear legal duty on the part of the respondents to do the things which the petitioner seeks to compel, we deny the writ of mandamus.[12]

## III.

## CONCLUSION

In light of the foregoing, we deny the writ of prohibition/mandamus.

Writ denied.

MAYNARD, Justice, concurring:

The majority decision in this case is right because it reaches the correct result and it does so by applying age-old principles of law. This Court can be proud of this decision because it exhibits a fidelity to our common law and our constitutional doctrine of separation of powers. It also displays a willingness of the Court to fulfill its intended function of independence from the clamor of popular opinion, political expediency and moralistic editorializing which has been long on rhetoric and short on facts and law.

This decision is really quite simple and straightforward. An executive officer exercised his discretion to do an act which he and his advisors determined to be in the State's best interest. This executive officer set forth in detail his legitimate reasons for doing this act. Some people did not like what the executive officer did, and they ran to this Court for help. The fact is, however, that this Court has no business telling an executive officer what to do under these circumstances just because some people would have done it differently. I reiterate that there is simply no authority empowering this Court to tell the executive branch of government how to conduct its affairs.

In fulfilling our constitutional role of applying the well-established law to the facts of this case, it is irrelevant what we think of the viability of the lawsuits dismissed by Commissioner Vieweg. It is irrelevant what we think of coal companies. It is irrelevant what we think of the current Governor and his policies. It is irrelevant who we think is ultimately responsible for the deficit in the workers' compensation fund. Our philosophies on "fundamental principles of justice" or whether we think the Commissioner's actions "pass the smell test" are likewise irrelevant. All of these considerations are for pundits and armchair politicians, not for judges.

Finally, that is what disappoints me about the two dissenting opinions filed in this case. Like much of what the public has heard on this matter, the dissents are full of speculation, surmises, guesses, and dark suspicions and devoid of sound legal analysis. The winners in this case are not only Commissioner Vieweg and the Performance Council, but also the rule of law. The job of this Court is to decide cases according to the applicable law and without passion, prejudice and partiality. Here, the Court did its job. Accordingly, I concur.

WORKMAN, Justice, concurring:

*A Rotting Carp*

This entire case reminds me of the old saying that "There's something rotten in Denmark." Well, there is definitely something rotten in West Virginia, and I am outraged not only by the aspects of the history of this case that the record permits us to get our teeth into, but perhaps even more so by various hidden agendas that smell [1] to the

---

12. We note that the attorney general filed a brief in this case in response to an order of this Court directing the attorney general to explain why he has not represented the State of West Virginia in the civil actions below. In this brief, the Attorney General asks us to overrule *Manchin v. Browning*, 170 W.Va. 779, 296 S.E.2d 909 (1982), and/or find W.Va.Code § 21A–2–6(17) unconstitutional. These issues are not properly before this Court and are not necessary to the disposition of this case. Also, these issues affect other executive officers who are not parties in this case. Accordingly, we decline to consider them.

1. One of the dissenters states "the majority seems to miss what must be so readily apparent to thousands of West Virginians—this deal just doesn't pass the smell test." The majority did not miss the smell. Unfortunately, whether this series of transactions passes the "smell test" is not the legal standard by which this Court determines whether to grant extraordinary relief in mandamus.

high heavens, but which we can't get our teeth into on this record. Because of the lack of factual development, I am limited in my ability to pull back the curtains so as to cast light upon the shrouded plans, conduct, and actions surrounding the entire process from inception to date. Indeed, a review of the available documents, most of which are only here as a result of being requested by this Court, suggests that anybody who is *not* confused, doesn't really understand what's going on. Nevertheless, even the sparse documentation available casts an odor not unlike that of a dead and rotting carp. This opinion will neither win friends nor influence people on either side of the philosophical aisle, but these are things that need to be said.

That I have voted with the majority should not be taken as an opinion that the dismissal of the underlying lawsuits was a wise or even proper course of action.[2] Nor should it be taken as agreement with *anything* that either of the last two Commissioners or the Performance Council have done in this entire issue. Moreover, the decision of the Court that neither prohibition nor mandamus is appropriate should not be construed as limiting the possibilities for bringing a lawsuit for breach of fiduciary responsibility, violations of open government requirements, violations of ethics requirements, or any other potential causes of action. In fact, as I shall make clear, I believe there should be a full and complete factual exposition of what occurred here so that the chips can fall where they may.

The reason I join the majority is that the law is absolutely clear that neither prohibition nor mandamus is available to order the Commissioner to dismiss the lawsuits. The Commissioner is a statutory animal, created, molded, and maintained by legislative authority. West Virginia Code § 21A–2–6 (1996) provides that the Commissioner "is the executive and administrative head of the bureau and has the power and duty to... exercise general supervision..., [s]upervise fiscal affairs and responsibilities..., [i]nvoke

any legal or special remedy..., [e]xercise any other power necessary to standardize administration, expedite bureau business, and assure the establishment of fair rules and promote the efficiency of the service[.]" West Virginia Code § 23–1–1(a) (1996) provides that the Commissioner "has the sole responsibility for the administration of this chapter except for such matters as are entrusted to the compensation programs performance council...." West Virginia Code § 21A–2–1 (1996) further defines the Commissioner's role, indicating that the Commissioner "shall be appointed by the governor, by and with the advice and consent of the Senate, and shall hold his office subject to the will and pleasure of the governor." Thus, the Commissioner's powers, duties, and limitations have been broadly delineated by statute and have been created exclusively by statute.

A mandate by this Court that the Commissioner must obtain court approval for dismissals of civil actions would be an improper intrusion by this Court into the legislative arena. "Courts are not free to read into the language what is not there...." *State ex rel. Frazier v. Meadows,* 193 W.Va. 20, 24, 454 S.E.2d 65, 69 (1994).

> It is not the province of courts to revise the work of the Legislature and supply what, in their opinion, are omissions of provisions necessary to make a statutory system or plan wise and expedient. If that could be done in one case it could be done in all, and the courts would become legislative, as well as judicial, tribunals, a result positively forbidden by the Constitution of the state.

*In re Application for License to Practice Law,* 67 W.Va. 213, 231, 67 S.E. 597, 604–05 (1910).

In *Boyd v. Merritt,* 177 W.Va. 472, 354 S.E.2d 106 (1986), we explained that "[t]his Court does not sit as a superlegislature, commissioned to pass upon the political, social, economic, or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the legislature to consider facts,

---

**2.** These lawsuits were all based on substantially the same legal theory. It would have been very simple for the Commissioner to have brought one test case, gotten a clear legal ruling on the theory of recovery, and if he prevailed, pursued the other claims under a contingency fee contract.

establish policy, and embody that policy in legislation." *Id.* at 474, 354 S.E.2d at 108. Similarly, in *Randolph County Board of Education v. Adams,* 196 W.Va. 9, 467 S.E.2d 150 (1995), we stated:

> When acting within its legitimate constitutional sphere, judicial deference given to both the West Virginia Legislature and administrative bodies has been confirmed. *See Appalachian Power Co. v. State Tax Dept. of W. Va.,* 195 W.Va. 573, 466 S.E.2d 424 (1995). The practice of deferring to rationally based legislative enactments is a paradigm of judicial restraint.

*Id.* at 24, 467 S.E.2d at 165.

One local newspaper recently ran an editorial to the effect that the Commissioner should not be allowed to drop the lawsuits. I was intrigued by the newspaper's comment that "We leave the complex legal details to the State Supreme Court, but, we hope they find a sound reason" to prevent the lawsuits' dismissal. Well, the devil is in the details. The fact is that the complex legal "details" involve the doctrine of the separation of powers and a whole history of legal precedent, and they to me are not just niceties that can be overlooked.

### Fiduciary Duty

I concur with the majority that there is a fiduciary duty on the part of the Commissioner and members of the Performance Council to protect the financial integrity of the Workers Compensation Fund. Because there is a fiduciary duty, the Petitioners may have the right to bring a breach of fiduciary duty suit against the Commissioner and the Performance Council. Before addressing that possibility in more depth, however, there are other matters that need to be addressed.

### $3½ Million Down the Drain

The waste of $3½ million of West Virginia taxpayers money is a sorry saga that ought to be examined closely. These "fee arrange-ments" (if one can be so charitable as to call them that) initially entered into by the previous administration [3] are shocking to the conscience. But the current administration,[4] which now uses the contract for these absurd and excessive legal fees and expenses and the $3½ million of state funds already spent thereunder as one of the primary bases for seeking the dismissal of the lawsuits, fails to point out that these contracts are cancellable by the State upon thirty days notice. Why didn't the Commissioner cancel the contracts and pursue these lawsuits either through the Attorney General's Office, through in-house counsel, or through contingency contracts with private lawyers, any of which would have cost the state only reasonable expenses unless there was recovery? Only when recovery was had would the contingency fees be taken from the sums recovered.

In fact, it seems that the outcome for the State is rather like that of Alice's situation in Wonderland-less or nothing.

> 'Take some more tea,' the March Hare said to Alice, very earnestly.
>
> 'I've had nothing yet,' Alice replied in an offended tone, 'so I can't take more.'
>
> 'You mean you can't take *less,*' said the Hatter: 'it's very easy to take *more* than nothing.'

Here, the State got less or nothing while the lawyers got more. The old proverb that a lawyer's opinion is worth nothing unless paid for has been extended to the maximum of absurdity in this case. The State has paid legal fees of $1,891,500 [5] to the firms of Fredeking & Fredeking and Galloway & Associates for "litigation recommendations."

A brief recitation of how the State came to pay nearly $2 million for the thoughts of Fredeking and Galloway is instructive. The process of providing full employment status for several lawyers appears to have been initiated by a solicitation letter from R.R. Fredeking, II, to John H. Kozak, Director of

---

3. Governor Gaston Caperton, Workers Compensation Commissioner, Andrew Richardson, and the Performance Council, which has had the same membership continuously since its creation in 1993.

4. Governor Cecil Underwood, Commissioner Vieweg and the Performance Council.

5. The entire tab to the taxpayers totals almost $3½ million, when other litigation expenses are included.

Legal Services Division, Bureau of Employment Programs. Mr. Fredeking, in a letter dated April 7, 1995, announced that he would like to meet with Mr. Kozak and then Commissioner Richardson to discuss a plan to collect delinquent premiums owed the Fund by the coal industry. Mr. Fredeking pitched his access to a "comprehensive coal ownership and control database" available to identify links to entitles who may be legally responsible for payment in addition to a nominal employer. It appears that shortly thereafter, Mr. Fredeking and Mr. Kozak met and discussed contracts. On May 12, 1995, Mr. Fredeking submitted a proposed agreement to Commissioner Richardson for the collection of delinquent worker's compensation accounts due from the coal industry.

By June of 1995, Commissioner Richardson must have contacted Attorney General Darrell V. McGraw, Jr., regarding the matter. In a letter dated June 8, 1995, to Commissioner Richardson, Managing Deputy Attorney General Deborah L. McHenry indicated that a meeting was scheduled regarding the collection of unpaid worker's compensation premiums. Ms. McHenry noted that the Attorney General requested written documentation outlining the extent of the problem with respect to unpaid premiums including the special legal theories involved and a proposal as to the functional structure, goals and objectives regarding collections work. Finally, Ms. McHenry requested that the Attorney General be advised as to who had been involved in the development of the Bureau proposal.

On June 12, 1995, Commissioner Richardson wrote to Attorney General McGraw stating that he had concluded

that there is a reasonable probability that several of the larger employers in the mineral extracting industry have engaged in a pattern and practice of behavior to circumvent the payment of justly due premium taxes to the Fund. In particular, we have reason to believe that these employers operated mines and other facilities through captive companies and through vastly under capitalized companies knowing such companies could not operate under the laws of this State, including the requirements to pay premium taxes due to Worker's Compensation Fund and remain viable entities. Other schemes also appear to have been used.

Commissioner Richardson indicated that as part of his *fiduciary* capacity on behalf of the Fund, he wanted to pursue actions against these larger employers.

Commissioner Richardson indicated that he had discussed litigation with Mr. L. Thomas Galloway, Esquire, of the law firm of Galloway & Associates of Washington, D.C. It was stated that Mr. Galloway had compiled an extensive proprietary database of information on the inner workings of the coal industry and that the database was not available anywhere else in the country. Commissioner Richardson sought the consideration and approval of the appointment of Mr. Galloway and other attorneys as special assistant attorney generals to work on these litigation matters by use of a contingency fee mechanism.

On July 7, 1995, Mr. Fredeking forwarded a contingent fee proposal of Mr. Fredeking and Mr. Galloway to collect the Worker's Compensation Fund debt. On July 31, 1995, the Attorney General appointed several attorneys including Mr. Galloway as special assistant attorneys general to the litigation team for the prosecution of causes of action to recover unpaid worker's compensation premiums. Interestingly, the appointment letter provided that:

it is contemplated that you will advance all expenses necessary to commence and maintain these actions. Your fee shall be subject to the approval of the court and shall not exceed the proper reasonable and customary fee rate which is equal to one-third (33–1/3%) of recovery for those cases which are filed in any circuit court and the fee not to exceed 20% of any premiums which are recovered due to any administrative action which is undertaken.

Apparently, this appointment letter was not satisfactory. The documentation, as well as public newspaper accounts at the time, indicate a disagreement between the Attorney General and Commissioner Richardson regarding the lawyers to be appointed as

well as the terms of appointment. Mr. Galloway declined appointment under the fee terms outlined by the Attorney General. During the month of August 1995, the Attorney General requested information so that the project of attempting to recover the delinquencies could proceed.

On August 21, 1995, the Attorney General's Office informed Commissioner Richardson that

none of the attorney's fees to be paid are to paid from the monies received for the Fund, or from any other State fund. Rather, said fees will be separately awarded by the Court against the delinquent employers to be paid from the delinquent employers' own fund, *not* from their delinquent premiums. All fees are required to be approved by the Court as customary, reasonable and proper.

It appears that no agreement was reached between Attorney General McGraw and Commissioner Richardson. On December 29, 1995, the Attorney General's Office informed Mr. Kozak of the impropriety of the Bureau approving any contract for legal services on the basis that the Bureau had no authority to enter into a contract for legal services. Apparently, the administration promptly went to the legislature seeking statutory authority for bypassing the Attorney General and for hiring outside counsel on this matter. Pursuant to the enrolled committee substitute for House Bill 4862, effective March 7, 1996, W.Va.Code § 21A–2–6 (17), was amended to authorize the Commissioner of the Bureau of Employment Programs, with the approval of the Compensation Programs Performance Council, to retain counsel outside the Attorney General's Office.

The Compensation Programs Performance Council immediately published an attorney solicitation and on June 21, 1996, approved the hiring of attorneys (including Mr. Galloway and Mr. Fredeking) to represent the Bureau in the collections litigation. The representation agreement provided that the law firms of Fredeking & Fredeking and Galloway & Associates would receive a flat fee of $5,200 for computer use and attorney related work for each recommendation made, as to each employer, regarding whether administrative and/or judicial action should be taken against one or more entities. An addendum to the agreement provided for a reduced legal fee of $2,340 for each recommendation made in 1998. To date, the Fredeking and Galloway firms have been paid $1,891,500 for their recommendations. Attorney's fees of this sort represent an absolutely outrageous "boondoggle." [6]

Moreover, the agreement provided for a contingent fee to be approved by a court or an administrative law judge in an amount no less than 20% of the recovery. This was in addition to the $5200 for every litigation memorandum! Further, and unbelievably, the Bureau agreed to pay the cost for consultation for screening, coding, storage and retrieval of documents and transcripts; microfilm readers; reproduction costs; mailing costs; telephone costs; paralegals based outside West Virginia; consulting experts; Lexis and Westlaw Research; and, ownership and control tracking and other computer related expenses not to exceed $5,000 per month. Interestingly, it appears that the contract had a one-year term and has been annually renewed by virtue of a change order approved through the State of West Virginia Purchasing Division. It appears that by virtue of purchase order no. BEP979 the representation agreement was extended for an additional year beginning July 1, 1999, and ending June 30, 2000. The Bureau Division Head, Ed Burdette, and Commissioner Vieweg signed the justification for the continuation of the coal litigation project on April 27, 1999. Now, four years after inception, some $3.4 million lighter and less than two months after renewing the representation agreement, Commissioner Vieweg, in his capacity as the fiduciary of the Fund, abandons this project with respect to the major big coal companies. We are left to wonder what the State has achieved. The record does not reflect whether the payment of over $1.8

---

6. Indeed, it appears that these payments for recommendations bolster the Attorney General's argument that the potential for harm and damage to the State when the power to coordinate the State's legal services is stripped from the Attorney General is immense.

million for "recommendations" resulted in the collection, through an administrative process or otherwise, of one penny of worker's compensation premiums.

### Backroom Deals

While I recognize that legislative matters generally involve negotiation and compromise by competing interest groups, a review of the record in this matter, together with oral arguments of this case, have left me with the clear impression that something is "rotten in Denmark." This entire matter is a landmine of hidden agendas. While there is no written agreement regarding a "deal" whereby the coal industry agreed to an increase in premium rates in return for the dismissal of the lawsuits at issue, all entities involved dance gingerly around this issue of a deal.

The Performance Council vote to drop 25 major coal companies from the lawsuits seeking to collect the unpaid premiums and interest came almost simultaneously with Governor Cecil Underwood's signing of a new Worker's Compensation Fund Bill making it easier for injured workers to qualify for permanent total disability benefits. It is extremely troubling that the Performance Council discussed the decision to dismiss the lawsuits in a secret executive session [7] letting a few large coal companies off-the-hook from huge potential liabilities after closed-door meetings, while regularly suing small business people and sole proprietors. Such action appears to violate all notions of open, fair and accessible government and leaves the public with no confidence in the operation of government.

### Performance Council

The conduct of the labor representatives on the Performance Council is troubling. If representations made to this Court are accurate, these individuals do not consult with the labor organizations they represent. If this is the case, the legislature should reconsider whether the Performance Council is functioning as intended. In any event, the fact that these individuals have not truly represented the viewpoints of their affiliated organizations leads to an environment that promotes "brokered deals" that are then "broken." This Court has been provided only with the shattered remnants and is unable to put the pieces together in a proceeding where there has been no factual development.

### Ubi Jus, Ibi Remedium (or For Every Wrong, There is a Remedy)

As law students, we learn that in the law, for every wrong there is a remedy. Because this Court cannot properly give relief by prohibition or mandamus, we cannot untangle the web that has been woven.

The fiduciary duties of the Commissioner are of great magnitude, and they are not diminished by our judicial restraint in this case. By declining to grant the requested mandamus, we do not disregard the fiduciary duty; we simply find that the existence of the fiduciary duty in the context of the record presently before us does not compel the conclusion that the Commissioner had a mandatory, non-discretionary duty to continue to pursue the underlying lawsuits.

Although this Court has not previously identified precisely the elements of a cause of action for a breach of a fiduciary duty, courts have held that the elements of such a cause of action are the existence of the fiduciary relationship, its breach, and damage proximately caused by that breach. *Pierce v. Lyman,* 1 Cal.App.4th 1093, 3 Cal.Rptr.2d 236, 240 (1991). "A cause of action for

---

7. Although the issue of the closed-door discussion was not raised in a manner which placed the issue properly before us, the parties argued the propriety of closing the Performance Council meeting on March 12, 1999. Discussions regarding pending litigation without an attorney present do not appear to be proper subjects of closed executive sessions pursuant to the Open Governmental Proceedings Act, West Virginia Code §§ 6–9A–1 to 7 (1993 and Supp.1998) (hereinafter the "Act"). *See* W. Va.Code § 6–9A–

4. We recently addressed whether a public meeting otherwise required to be open under the Act, could be closed because an agency attorney was present in *Peters v. Wood County Commission,* 205 W.Va. 481, 519 S.E.2d. 179 (1999). In *Peters* we held that privileged communications between a public body subject to the Act and its attorney are exempted from the Act, as long as the statutory requirements of the Act are met. Syl. Pt. 5, *Peters,* 205 W.Va. at 482–83, 519 S.E.2d. at 180–81.

breach of fiduciary duty requires proof of fraud, breach of trust, or an action outside the limits of the fiduciary's authority." *Gerdes v. Estate of Cush*, 953 F.2d 201, 205 (5th Cir.1992).

Thus, there may well be a cause of action for the alleged breach of a fiduciary duty. Such a lawsuit would entail a complete and thorough exposition of the facts at the heart of this issue. The people of West Virginia deserve the facts. They deserve to find out how and why the present and former administrations have spent three and one-half million dollars of their tax money for nothing, and what closed-door meetings and/or deals were held to decide the issues at the heart of this dispute.

Will the Commissioner really dismiss these lawsuits without further explanation in view of this fiduciary duty?

If he does, will a lawsuit(s) for breach of fiduciary duty be brought against the Commissioner and the Performance Council?

Will the people of West Virginia really know the truth?

Stay tuned.

## DAVIS, Justice, concurring:

### *The Separation of Powers Clause Prohibits Granting the Relief Sought in this Case*

In order for this Court to have taken the steps urged by the petitioners, we would have had to destroy the constitutional division of power between the three branches of state government. In spite of any emotional appeal that may be engendered by the dissenters in this case, it is not now nor will it ever be the province of this Court to abolish the clear separation of powers that is etched in our state constitution and guaranteed by the federal constitution.

This Court observed in *State ex rel. Lambert v. Stephens*, 200 W.Va. 802, 809, 490 S.E.2d 891, 898 (1997) that "[a]s part of our constitutional democracy on both the national and state level, we ascribe to the principle that there shall be three equal branches of government—legislative, executive, and judicial." It is firmly rooted in Article V, § 1 of the state constitution that "[t]he legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others[.]" As simplistic as the latter few words may appear, they are in reality a complex formula that has kept the government of this state intact since its founding in 1863.

The Separation of Powers Clause is not self-executing. Standing alone the doctrine has no force or effect. The Separation of Powers Clause is given life by each branch of government working exclusively within its constitutional domain and not encroaching upon the legitimate powers of any other branch of government. This is the essence and longevity of the doctrine. In the case at hand the petitioners would have this Court obliterate the time-honored bright lines between the branches of our state government. A majority on this Court has refused to violate the constitution.

In my judgment, this case, brought in prohibition, with little to no factual record, turned on a simple point of executive discretion. The authority being exercised by the respondents and challenged by the petitioners is discretionary authority so long as that discretion is exercised within the bounds of the law and in accordance with the highest fiduciary duty. Accordingly, on the limited record available, I cannot conclude that the decision of the commissioner to drop the lawsuits constituted a violation of his fiduciary duty. This issue is simply not appropriate for issuance of a writ in mandamus or prohibition. No statute, rule or constitutional provision placed any direct limitation on the respondents' authority to drop the civil suits in question. This Court has recognized that " '[w]hen an act is committed to executive discretion, the exercise of that discretion within the constitutional bounds is not subject to the control or review of the courts. To interfere with that discretion would be a violation of the doctrine of separation of powers.' " *State ex rel. Robinson v. Michael*, 166 W.Va. 660, 674 n. 12, 276 S.E.2d 812, 820 n. 12 (1981), quoting *Public Defender Agency v. Superior Court*, 534 P.2d 947, 950 (Alaska 1975).

I need to pause for a moment to clearly illustrate the incorrectness of the path the petitioners chose to take in bringing this action. If this Court had relinquished its duty to uphold the Separation of Powers Clause in this case, where would the litigation end? Here are but a few examples:

1) State tax commissioners often institute tax amnesty programs as an alternative to commencement of litigation to collect delinquent taxes. May this Court require, through the issuance of a rule in prohibition, the Commissioner of the West Virginia Department of Tax and Revenue to explain his reasons for implementing a tax amnesty program, rather than pursuing suit against individual taxpayers?

2) The attorney general has decided against negotiating separate settlements against tobacco companies unlike several other states in favor of continuing to be part of the global settlement. Can a citizen and taxpayer subject the attorney general to suit based upon an allegation that a more favorable compromise can be obtained through separate negotiations?

The dissenters in this case have not even paused to consider the utter chaos that would ensue if this Court abdicated its duty to obey the Separation of Powers Clause. With their position I cannot agree. Therefore, I concur.

McGRAW, Justice, dissenting:

Wrong, wrong, wrong!

Three days before leaving office in 1977, a former Governor settled the State of West Virginia's lawsuit against Pittston Coal for its culpability in the Buffalo Creek disaster, thereby depriving the people of West Virginia of their day in court against a coal company that had betrayed the public trust and ignored its obligations to society.[1]

No lives were lost in the cases presently at issue before this Court, but Commissioner Vieweg's decision to drop these lawsuits against various coal companies deprives the citizens of their day in court, just as surely and just as unfairly as did the decision of a former Governor over 22 years ago.

In this context, of special concern to me is the dark cloud hanging over the whole transaction. Commissioner William Vieweg, as he tells in his affidavit to this Court, is the selfsame William Vieweg who, for ten years in which the allegedly improper practices were occurring, was employed by one of the defendants, Island Creek Coal, as a "manag[er] for all insured and self-insured compensation programs for Island Creek Employees...."[2]

And this is one of the most troubling aspects of this case to me, for the majority seems to miss what must be so readily apparent to thousands of West Virginians—this deal just doesn't pass the smell test. Even if I were to agree that the Commissioner had the right to drop these suits—and I don't—I would still be concerned about the conflict of interest. Such conflicts erode the public's confidence in government.[3]

1. Jack McCarthy, *A Man-made Disaster*, Sunday Gazette Mail, Feb. 23, 1977 (marking the 25th anniversary of the tragedy). The article also described the event:

Water and coal refuse, 30 feet high and 550 feet across, burst through its hillside location after two days of rain, cascading more than 15 miles down Buffalo Creek in Logan County. Moving at 5 miles per hour, the water took about three hours to wash out a succession of small coal towns and reach the confluence of Buffalo Creek and the Guyandotte River at Man.

The disaster killed 125 people, injured 1,000, and left 4,000 homeless. Five hundred and seven houses were lost or demolished 44 mobile homes were destroyed another 273 houses were severely damaged, while nearly 663 houses suffered damage to varying degrees. In addition, 30 businesses, 1,000 vehicles, 10

bridges, and power, water and telephone lines were destroyed, and the county road and the rail lines servicing the valley's coal mines were severely damaged.

The flood also left an indelible scar on the survivors. In many ways, it damaged all West Virginians.

2. *See also* Editorial, *Workers' Comp, Court Should Dump Vieweg*, Charleston Gazette, July 3, 1999 (noting that during Vieweg's tenure, contract miners for Island Creek "ran up $47.5 million in delinquencies, the largest amount owed by any company [sued]").

3. Some scholars have debated this issue, in the context of the actions of members of the legislative branch of government, but the argument applies as well to the executive:

My grandparents, who were not lawyers, but farmers, may not have understood the complexities of our workers' compensation law, or the legal underpinnings of these suits, but had an expression for the current state of affairs, for even they knew that it is not a wise decision to "let the fox guard the hen house."

Another issue of grave concern is the fundamental unfairness of Commissioner Vieweg's decision. It shifts the burden of paying some $250,000,000 in coal company debt to the other employers in West Virginia, who have never engaged in any charades to avoid paying their workers' compensation premiums. As so proudly pointed out by the Chamber of Commerce, 97% of all West Virginia business are small businesses, and "the Chamber" is "the voice of business in West Virginia." If the Chamber truly represents the feelings of 97% of the dry cleaners, restaurants, convenience stores, and other small businesses, I am simply incredulous that this "voice" is not crying out and demanding that Commissioner Vieweg take these suits to trial. Because it is indeed the other, honest businesses in West Virginia, including those coal company's that did not employ defaulting contract miners, who must bear this cost.

Commissioner Vieweg maintains that a new plan of the Division will recoup the $200 to $250 million by imposing a surcharge on other coal companies, and this plan, therefore, means that only coal companies will be responsible for paying back the debt. Beyond the continuing unfairness to those coal companies which paid their own way, this argument makes no sense to me. If the Workers' Compensation Fund made decisions over the last 10 to 15 years about raising rates for other employers or reducing workers' benefits, (which it did) then the

Fund must have figured into those rates the fact that there was a huge deficit, at least a quarter of a billion of which comes from the payment-dodging coal companies being sued.

That is to say, even though there is apparently some new scheme now whereby "only" coal companies will pay back the $250 million, those bad debts, which have piled up over 20 years, have had an impact on the rates of every employer and the benefits of every injured employee. In his affidavit, Vieweg, states that:

> On May 20th, 1997 ... the Council unanimously approved a premium rate-making plan and base premium rates designed, among other things, to eliminate a staggering deficit and return the workers' compensation system to a sound financial basis, including elimination of across-class subsidies *on a prospective basis* for underground coal mining and certain other classes of business and industry;

(Emphasis added). Since prospective means, "in the future only," I don't see what this says about what has occurred over the last 25 years.

Also, I feel it is important to note that historically, the Fund has been subject to changing political winds, like all of government. There is nothing that would prevent the Fund, in the event of a massive recovery from the defendant coal companies, from eventually *lowering* premiums in all categories. Indeed political pressure from all the other employers would probably demand such a change, if such a reduction in the deficit were to occur. So it is disingenuous to argue that coal has been forever "walled off." Reducing the $1.9 billion deficit by $250 million would eventually have to benefit

Admonitions to legislators that they have an ethical obligation to avoid actions that could result in public disapproval fit naturally into discussions of congressional ethics. One of the central goals of the ethics codes, after all, is to promote public confidence in the legislative branch and thereby to reinforce the legitimacy of government. The same point can be put in terms of institutional loyalty and responsibility: unseemly behavior by a few members makes it harder for their colleagues to do their own jobs. Professor Andrew Stark, in an illuminating analysis, has explained the rationale for subjecting officeholders to the constraints of an appearance of impropriety disciplinary standard: its purpose is "to heighten their democratic representativeness—in order to ensure that officials perceive reality the way the public does and are sensitive to norms that the public harbors."

Ronald M. Levin, *Congressional Ethics and Constituent Advocacy in an Age of Mistrust*, 95 Mich. L.Rev. 1, 99–100 (1996) (quoting Andrew Stark, *The Appearance of Official Impropriety and the Concept of Political Crime*, 105 Ethics 326, 349 (1995)).

all the employers and employees in this state, including Affiliated Construction Trades Foundation and the employees and employers it represents.

The majority glosses over the fact that we are talking about one quarter of a *billion* dollars. To place this in perspective, according to figures supplied by the Governor for the fiscal year ending June 30, 1998, the entire amount of tuition and fees received by institutions of higher education in West Virginia totaled only $194,834,000.[4] I can't see that every family of every child attending college in West Virginia would like to donate a year's worth of tuition and fees to coal companies.

The majority is simply incorrect. This Court should grant a Writ of Mandamus compelling Commissioner Vieweg to proceed with the lawsuits, at least until such a time as the likelihood of recover may be more readily determined. To not do so would essentially throw away a very reasonably chance at an extremely large recovery, and do a great disservice to the people of the State of West Virginia. We have defined our procedures regarding mandamus:

> "A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969).

Syl. pt. 1, *State ex rel. West Virginia Reg'l Jail and Correctional Facility Auth. v. West Virginia Inv. Management Bd.*, 203 W.Va. 413, 508 S.E.2d 130 (1998). We have not always been so timid in the application of our constitutional derived power of mandamus:

The trend in this Court has been to enlarge the scope of mandamus. *State ex rel. Smoleski v. County Court of Hancock County*, 153 W.Va. 307, 168 S.E.2d 521 (1969), especially where there is an urgent question of public policy or where there is no reason for delaying adjudication of the issue by the highest court of the State. *Walls v. Miller*, 162 W.Va. 563, 566, 251 S.E.2d 491, 495 (1978) (footnote omitted).[5] In the past, we have not hesitated to grant extraordinary relief where an administrative official has refused to initiate litigation on behalf of the State. For example, in *State ex rel. Ginsberg v. Naum*, 173 W.Va. 510, 318 S.E.2d 454 (1984), we held that a county prosecutor had a nondiscretionary duty to prosecute welfare fraud cases. I would posit that Commissioner Vieweg has a similar duty to prosecute the actions at issue in this case, based upon his fiduciary duty to protect the assets and financial integrity of the Fund. *See Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1989) (awarding mandamus based upon, *inter alia*, breach of fiduciary duty to administer retirement fund).

Furthermore, in this case we are not concerned with a mere point of law in routine civil litigation, but rather with the lives and limbs of countless thousands of living, breathing, human beings who, along with their families, have suffered loss as a result of the alleged conduct of the defendants in these cases. The Legislature intended that this needless suffering should stop, and it is our duty to effect the legislative purpose by such means as will best accomplish that end.

Affiliated Construction Trades Foundation has a clear legal right. Affiliated Construction Trades Foundation, as an employer that pays premiums into the fund, has been affected in the past by the deficit, and specifically by the impact of the missing $250 mil-

---

4. West Virginia Comprehensive Annual Financial Report, Year Ending June 30, 1998 at 19.

5. We felt compelled to note in *Walls*, which concerned the application of mine safety rules, that the industry has not always been kind to its workers:

> Furthermore, in this case we are not concerned with a mere point of law in routine civil litigation, but rather with the lives and limbs of countless thousands of living, breathing, hu-

man beings who, along with their families, have suffered needless loss since time out of mind in an industry which appears inevitably to suck the life's blood from the miner as he takes the coal from the earth. The Legislature intended that this needless suffering should stop, and it is our duty to effect the legislative purpose by such means as will best accomplish that end.

*Walls*, 162 W.Va. at 567, 251 S.E.2d at 496.

lion in question, and has paid, is paying, or will pay higher premiums than it otherwise would because of the alleged actions of the defendant coal companies. Affiliated Construction Trades Foundation also brings suit on behalf of its employees who have likewise been affected. Therefore, both Affiliated Construction Trades Foundation and the employees it represents have a clear legal right to see the Commissioner perform his duties under the law to manage the Fund so as to "fix and maintain the lowest possible rates of premium taxes."

Vieweg has a legal duty to follow the law and properly manage the Fund, fixing the lowest rates possible and bearing in mind his fiduciary obligation to the fund. West Virginia Code, § 23–2–4 states:

(a) The commissioner, in conjunction with the compensation programs performance council, is authorized to establish by rule a system for determining the classification and distribution into classes of employers subject to this chapter, a system for determining rates of premium taxes applicable to employers subject to this chapter, a system of multiple policy options with criteria for subscription thereto, and criteria for an annual employer's statement providing both benefits liability information and rate determination information.

\* \* \*

(2) The rule shall be consistent with the duty of the commissioner and the compensation programs performance council *to fix and maintain the **lowest possible rates** of premium taxes consistent with the maintenance of a solvent workers' compensation fund and the reduction of any deficit that may exist in such fund and in keeping with their **fiduciary obligations** to the fund;*

W. Va.Code § 23–2–4(a)(2) (1995) (emphasis added). There is no question that adding an additional $250 million to the Fund's coffers will help to fix the lowest possible rates and reduce the deficit.

The petitioner has no other adequate remedy. One might argue that mismanagement of the Fund should be dealt with directly by the voters, who are free to remove Commissioner Vieweg from his position by choosing to vote against the Governor in the next election.[6] However, by the time the voters have another say, the suits will have been dropped and the chance to recover the $250,-000,000, a tremendous sum of money, will have been forever lost.

There has been much ado about the amount of money expended ·thus far in the pursuit of these cases. The majority, relying upon the Commissioner's information, quotes the following:

WHEREAS, it appears that the amount of defaulted premium due and owing approximates $95 million and the interest and penalties thereon also approximate $95 million and *further accumulating at the rate of $3 million per **MONTH**;* and

WHEREAS, outside limitation expenses to date have totaled $3 million; and

WHEREAS, the Division may expect to incur ongoing outside litigation expenses of $30,000 per month . . . .

Majority at 691, 520 S.E.2d at 858 (emphasis added). Even my basic mathematical powers tell me that $30,000 per month is only *one percent* of the $3,000,000 *increase* in penalties and interest accruing each month, and that the total amount spent to date represents only *one month of such accruals.* Clearly, the Commissioner has refused to consider the amount expended in the context of the recovery at stake, and the majority has been seduced by this logic.

Finally, I must again point out the hypocrisy of the Commissioner's decision to drop the suits. Even Commissioner Vieweg himself, perhaps in an earlier, more simple time, held forth the importance of reducing the Fund's deficit, and working together to see that all West Virginia business owners pay their fair share, and no more:

When I was appointed by to the Office of the Commissioner of the Bureau of Em-

---

**6.** In fact, a member of the majority had been quoted saying as much. *See* Paul J. Nyden, *Vieweg Has Discretion to Kill Suits, Court Told,*

*But Unions Say He Has Duty to Protect Workers' Comp.*, Charleston Gazette, June 30, 1998.

ployment Programs by Governor Underwood on February 13, 1997, I committed to restoring the Workers' Compensation division to a sound, financial condition. I would like to share with you what the Compensation Programs Performance Council and the Bureau, working together, are doing to achieve this objective. . . .

Vision 1. First, reduce and then eliminate the $2.2 billion deficit, which now burdens the creation of jobs and limits economic growth and development in West Virginia. . . .

Vision 3. Aggressively *prosecute* claimant and employer *fraud* in workers [sic] compensation because fraud reduces funds available to support legitimate claims and increases the employer burden. . . .

Positive results are being achieved and we will continue to build effectively and broadly on these results. I must issue a warning, a serious caveat. Any missteps or initiatives to reverse this fragile process will cripple the well-structured goals and objectives and could destroy the process altogether. Our job is to "stay the course" and this together we will do.

William F. Vieweg, *An Open Letter to All West Virginia Employers,* West Virginia Workers' Compensation, Inside Look, Nov. 1997 (emphasis in original). These words now ring hollow.

Just as a former Governor's decision to let Pittston off the hook left the people of West Virginia with the expense of cleaning up[7], this decision of the present administration leaves the honest employers and business owners of West Virginia cleaning up somebody else's mess. The defendants in question have allegedly acted with callous disregard for the rule of law and the common good. To allow the executive branch to reward this activity is simply unconscionable, and so I must, respectfully, dissent.

STARCHER, Chief Justice, dissenting:

To preserve and promote the rule of law, this Court has the power and duty to act—in a principled and appropriately limited fashion—to see that fundamental principles of justice are not violated.

Was the rule of law being violated in a fundamental way, when 18 large coal companies allegedly carried out a sustained program of using undercapitalized shell corporations to mine the companies' coal—thereby avoiding huge environmental and worker liabilities?

That remains to be seen, because the companies have not yet been brought to account for their actions before a trial court.

However, based on the limited record before us, it is clear that the State had made out a good case, in the underlying lawsuits, that the use of contract mining companies to avoid paying the full cost of mining coal—including workers compensation premiums—was a scam that took $200,000,000 from the workers of West Virginia and put it in the hands of the stockholders of a few large coal companies.

As the United Mine Workers of America ably argue in their brief *amicus curiae,* there are plenty of excellent and viable legal theories that allow recovery of the fruits of a scam from a wrongdoer—even decades after the scam is finished.

I'd like to present several hypothetical situations that resemble the instant case. In these situations, would this Court step in to uphold the rule of law?

If a prosecuting attorney who had been a senior partner of a law firm when the firm defrauded elderly people, dismissed criminal fraud charges against his former cronies—would this Court step in?

If the Department of Welfare cut a deal with a parent who had abused their children to drop all abuse charges, because a group of other parents had agreed to pay for therapy for the abused children—would this Court step in?

If a child was orphaned by a drunk driver, and the child's guardian, who was the best friend of the drunk driver, dismissed the

---

7. The taxpayers of West Virginia eventually had to pay the United States government almost $10 million for the clean up efforts, plus interest.

*See United States of America v. State of West Virginia,* 764 F.2d 1028 (4th Cir.1985), *aff'd* 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987).

child's lawsuit against the driver—would this Court step in?

My answer to each of these questions is "yes"—this Court would step in to prohibit conduct that was clearly wrongful and contrary to the ends of justice and the rule of law.

And so we should step in in this case. We should temporarily require that these lawsuits not be dismissed, and remand the case for a thorough review by a circuit court of the circumstances surrounding the lawsuits' proposed dismissal.

What especially concerns me is that a public official files a number of lawsuits in 1998, and the same public official then dismisses the suits in 1999. In doing so, the action goes a long way toward immunizing the public official's former business colleagues from any attempt by *a future administration* to collect these debts.

What a blow to West Virginia workers! What a sweet deal for the coal companies that made a fortune using contract mining companies! And what a sour deal for the West Virginia businesses—including responsible coal companies—that played by the rules, and paid their fair share of workers' compensation premiums!

Finally, what a stain on the public face of government! It just looks terrible for a former coal company executive to spearhead a move that has the effect of giving his former business colleagues immunity from civil liability.

Of course, it would take some careful legal crafting for this Court to fashion a remedy in this case that would not excessively intrude on the legitimate prerogatives of the executive branch. But this Court can take on and perform difficult tasks—that is what we are paid to do.

As a result of this Court's courage and creativity in the past, our state is a better

place. We should show that courage and creativity in this case. We should step in to protect justice and the rule of law.[1]

---

1. *I note that the narrow issue decided in the majority opinion is whether the petitioners are entitled to a writ of prohibition or mandamus in this Court. The decision in the majority opinion is not controlling on the issue of whether the petitioners or any other person may seek to block the dismissal of the lawsuits against the coal* companies in the circuit courts where those cases are filed. Circuit courts, of course, have a much broader original jurisdiction than does this Court. The petitioners may consider whether taking action in circuit court would serve the interests of West Virginia and her people.